**TRAVIS BANK & TRUST, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 13781.**

Court of Appeals of Texas, Austin.

Oct. 26, 1983.

Mark T. Mitchell, Kammerman, Yeakel & Overstreet, Austin, for appellant.

Mark White, Atty. Gen., Gilbert J. Bernal, Jr., Asst. Atty. Gen., Austin, for appellee.

Before SHANNON, POWERS and BRADY, JJ.

POWERS, Justice.

Travis Bank & Trust, a banking corporation organized and existing under the laws of the State of Texas, appeals a money judgment entered against it in the State's suit on, or for wrongful dishonor of, two letters of credit issued by the bank.[1] We will affirm the judgment of the trial court.

The two letters of credit are almost identical in form. The first, entitled "Irrevocable Letter of Credit No. 140," reads as follows:

> We hereby establish our irrevocable letter of credit in favor of the State of Texas for the account of Kelly Michael Corporation doing business as _____ located 1701 Guadalupe Austin, Texas under Mixed Beverage permit _____. This letter of credit is effective up to the aggregate amount of $7,500.00. This letter of credit shall remain in effect until the Travis Bank and Trust is released or discharged by the Administrator of the Texas Alcoholic Beverage Commission or until the expiration date of April 12, 1980. This is your authority to draw drafts for any amount, or the full amount not to exceed $7,500.00. This letter of credit is given as security for liability of gross receipt taxes and/or permit fees, including interest and penalties, which may accrue under the provisions of the Alcoholic Beverage Code and the Rules of Procedure of the Texas Alcoholic Beverage Commission. The Administrator of the Texas Alcoholic Beverage Commission, acting for the State of Texas, may draw upon this letter prior to its expiration if, in his opinion, unpaid permit fees and/or unpaid tax liability, whether disputed or not, might exist, but any such funds will be held in a suspense account subject to final determination of liability under due process of law.
>
> All drafts are to be marked "Drawn under Letter of Credit No. 140."

The second letter of credit entitled "Irrevocable Letter of Credit No. 184," includes a permit number and trade name where those elements are left blank in "Irrevocable Letter of Credit No. 140." The second concludes with a provision that "all drafts are to be marked 'Drawn under Letter of Credit No. 184.'" As indicated in the body of each document, the credits were for the purpose of securing the liability of Kelly Michael Corporation for gross receipt

---

1. All references to the "Code" or to section numbers are references to the Texas Business and Commerce Code (Supp.1982).

Chapter 5 of the Code contains some but not all the rules of law applicable to "letters of credit." We conclude that the documents issued by the bank were "letters of credit" within the scope of Chapter 5. Although the two documents issued by the bank do not require a documentary draft, so as to be included automatically within the term "letter of credit," we believe that term to be "conspicuously" included within each document because it is undisputed that the State composed the two documents. Therefore, we must hold that the State ought to have noticed the term "letter of credit" even though it is not "conspicuous" as a matter of law. See §§ 1.201(10), 5.102, 5.103(a)(2).

For the purposes of Chapter 5 of the Code, "credit" and "letter of credit" are defined in § 5.103(a)(1) as follows:

"Credit" or "letter of credit" means an engagement by a bank or other person made at the request of a customer and of a kind within the scope of this chapter (Section 5.102) that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit....

The beneficiary, merely by presenting a documentary draft or demand for payment, "warrants to all interested parties that the necessary conditions of the credit have been complied with. This is in addition to any warranties that may arise under Chapters 3, 4, 7 and 8." § 5.111.

Honor of credit on presentment of a draft or other demand for payment depends *solely* upon whether the draft or other demand "complies with the terms of the relevant credit regardless of ... the underlying contract ... between the customer and the beneficiary." § 5.114(a). "The issuer is not excused from honor of such a draft or demand by reason of an additional general term that all documents must be satisfactory to the issuer, but an issuer may require that *specified* documents must be satisfactory to it." (emphasis added).

Like all duties within the scope of the Code, the issuer's duty to honor its credits "imposes an obligation of good faith in its performance...." § 1.203.

taxes, permit fees, interest, and penalties arising from its operation under a permit issued by the Texas Alcoholic Beverage Commission.

The Administrator determined that the permit holder owed $13,417.37 secured by the letters of credit. When payment was not made by the permit holder, the Administrator, in a letter to the bank, required the bank to honor the credit established by its letters of credit. The letter, dated February 20, 1980, reads as follows:

> Ref: St. Michaels, Austin—MB 108903
>
> Irrevocable Letters of Credit No. 140 and No. 184

Dear Sir:

Our Austin Auditing Office has submitted Audit No. 1 of the above subject permit covering the period from June 29, 1978 thru [sic] December 13, 1979. In conducting this audit, a delinquent gross receipts tax of $13,417.37 was established.

Letters were written to the permittee on January 23, 1980 and February 5, 1980, requesting payment of this amount. As of today, we have not received payment.

Since your Bank executed the Letters of Credit supporting the permit during this period, we ask that you submit payment of the delinquency in the amount of $13,417.37. Payment should be in the form of a Cashier's Check and made payable to the Texas Alcoholic Beverage Commission.

Your prompt attention to this matter will be greatly appreciated.

The bank refused to honor the credit and did not inform the State of any reason for its refusal. The present suit followed.

The suit was tried upon facts stipulated in writing by the parties. In the trial court's conclusions of law, it determined that the State had "substantially complied" with the terms of the letters of credit because "literal compliance" was not required, that the bank "waived the requirement, if any, of a draft," and that the State was entitled to recover from the bank irrespective of the form in which the State communicated its demand for payment. The trial court entered judgment for the State in the amount of $13,417.37.

The principal issue raised by the bank is one of contractual interpretation—whether the trial court erred in evaluating the sufficiency of the State's demand for payment under a rule of "substantial" or reasonable compliance instead of a rule of "strict" compliance. Implied in the bank's invocation of the latter rule is the premise that the letters of credit made the *form* of the State's demand for payment a *condition* of the bank's liability on the credit, with which condition the State did not strictly comply. *Cypress Bank v. Southwestern Bell Telephone Co.*, 610 S.W.2d 185, 187 (Tex.Civ. App.1980, writ ref'd n.r.e.) (the expiration date stated in a letter of credit is an essential condition of the credit, and the issuer incurs no liability on demands for payment presented after the expiration date); *Siderius, Inc. v. Wallace Company, Inc.*, 583 S.W.2d 852, 859 (Tex.Civ.App.1979, no writ) (except for cases where the issuer knows the documents to be fraudulent, he must honor his *documentary* letter of credit on the presentation of a demand for payment accompanied by "documents which precisely and strictly conform to the requirements of the letter of credit . . . .")[2]

The bank argues on appeal that the State's "requests for payment were never in the form of a draft, nor were they appropriately marked pursuant to the express and unambiguous terms of the letters [of credit]." The bank's brief and statements in oral argument refine this broad contention to an argument that the State's letter of February 20, 1980 was not in strict com-

---

2. We deal in the present case not with a "documentary letter of credit" but with a "clean" letter of credit, that is, one in which accompanying documents are not required for honor of the credit. See § 5.103(a)(2), defining "documentary draft" as one the "honor of which is conditioned upon the presentation of a document or documents," the word "document" being defined to mean "any paper including document of title, security, invoice, certificate, notice of default and the like."

pliance with the bank's letters of credit for two specific reasons: (1) the State's letter was not in the form of a "draft" as required by the letters of credit because the word "draft" is defined in §§ 3.104(a), (b)(1) to include only *negotiable* instruments containing an order to pay and the State's letter of February 20, 1980 was not such an instrument; and (2) the State's letter was not, as required by the letters of credit, marked with the legends "Drawn under Letter of Credit No. 140" and "Drawn under Letter of Credit No. 184," although the State's letter did contain the reference "Irrevocable Letters of Credit No. 140 and 184." We reject the bank's contentions for the reasons which follow.

The rule of strict compliance, for which the bank contends, is obviously important for the predictability it produces in commercial transactions dependent upon letters of credit. The rule of "substantial" or reasonable compliance, adopted in several jurisdictions, has been criticized on the ground that it inhibits the use of letters of credit, and attendant transactions, because under that rule issuers are required and permitted to make purely subjective evaluations about what is "reasonable." Farrar, Stanley, "Letters of Credit," 38 Bus.Law 1169, 1174–75 (1983). These matters need not concern us in the present appeal, however, for we conclude that the letters of credit issued by the bank did not impose, as a condition of its obligation to pay, the presentment of a negotiable order to pay, that is, a "draft" as that word is defined in §§ 3.104(a), (b)(1). In contending that a negotiable order to pay was required by the terms of the bank's letters of credit, with which the State was bound strictly to comply, the bank actually attempts to bind the State to strict compliance with the bank's unilateral *interpretation* of the word "draft," as the word is used in the letters of credit issued by the bank. The bank's interpretation is impermissible in the present context.

The conditions ordinarily found in letters of credit are *express* conditions as to (1) the *time* within which the beneficiary must perform in order to claim payment and (2) the *documents* which must accompany any draft on the credit. 3 R. Anderson, Uniform Commercial Code, § 5.101:8 at 354 (2d ed. 1971). *Cypress Bank v. Southwestern Bell Telephone Co., supra,* illustrates the former condition and *Siderius, Inc. v. Wallace Company, Inc. supra,* illustrates the latter. We have found no prohibition against including in the letter of credit a provision specifically delineating the precise form and contents of any demand for payment made on the credit, together with an express provision that makes demand in the specified form a condition of the issuer's obligation to pay. In the present case, we hold simply that the letters of credit issued by the bank did not impose upon the bank's obligation to pay a condition of that nature.

The bank's letters of credit authorized the Commissioner "to draw drafts" on the credit and provided that "[a]ll drafts are to be marked 'Drawn under Letters of Credit'" numbered 140 or 184. Neither of these provisions nor any other provision in the letters of credit reasonably or fairly suggests that presentment of a negotiable draft, bearing the requisite legend, was a *condition* precedent to payment on the credit.

> While no particular words are necessary for the existence of a condition, such terms as "if", "provided that", "on condition that", or some other phrase that conditions performance, usually connote an intent for a condition rather than a promise. In the absence of such a limiting clause, whether a certain contractual provision is a condition, rather than a promise, must be gathered from the contract as a whole and from the intent of the parties.

*Hohenberg Bros. Co. v. George E. Gibbons & Co.,* 537 S.W.2d 1, 3 (Tex.1976).

▮▮▮ What meaning shall we then assign to the word "draft" as it is used in the letters of credit? While comprehensive, the word is not ambiguous and has a well-understood meaning. The word "draft" is a common synonym for "bill of exchange." *Phillips Petroleum Co. v. Harnly,* 348 S.W.2d 856, 862 (Tex.Civ.App.1961, writ

ref'd n.r.e.). In the law merchant, the term "bill of exchange" was defined merely as a requirement or request in writing for the payment of a specified sum of money to a third person or the drawer himself, at a stated time, absolutely and at all events, directed by the drawer of the writing to the one of whom payment was required. *Vaughn v. Farmers' & Merchants' National Bank,* 59 Tex.Civ.App. 380, 126 S.W. 690, 691 (1910, writ ref'd); 11 Am.Jur.2d "Bills and Notes," §§ 13, 14, 110 (1963). Various informalities are immaterial. 10 C.J.S. "Bills & Notes," § 4, p. 407 (1938). Where the date of payment is not specified in the draft, it is payable on demand. 11 Am. Jur.2d, *supra,* § 87, p. 118. Under the Code, a "draft" may be either negotiable or non-negotiable, as discussed in the footnote.[3] The word "draft," standing alone, implies neither the attribute of negotiability nor its absence.

■ The general principles of contract law were not displaced by enactment of the Code § 1.103. Therefore, the same general principles which apply to the interpretation of written contracts generally govern letters of credit. *Republic National Bank v. Northwest National Bank,* 578 S.W.2d 109, 115 (Tex.1978). One such principle is that a word used in a contract is to be given its ordinary meaning unless the context reveals a strong reason for assigning to the word a different meaning. *Board of Insurance Commissioners of Texas v. Guardian Life Insurance Co.,* 142 Tex. 630, 180 S.W.2d 906, 908 (1944); *Shell Petroleum Corp. v. Royal Petroleum Corp.,* 135 Tex. 12, 137 S.W.2d 753, 758 (1940). The absence in the letters of credit of any requirement of negotiability suggests that negotiability of the draft was unimportant to the parties. The issuer of a letter of credit, if it pays the credit in good faith and with no notice of fraud or forgery, obtains the right of immediate reimbursement from its customer, who bears alone the risk of any misinterpretation of the beneficiary's demand for payment. §§ 5.107(d), 5.114(c). In the context of the present case, therefore, we can imagine no additional benefit accruing to the bank or its customer by reason of any requirement that the State's demand for payment be in the form of a negotiable instrument. The bank has not suggested that any such benefit exists.

■ We hold, therefore, that the letters of credit issued by the bank permitted the State to draw upon the credit by means of *either* a negotiable or a non-negotiable "draft," that is, a "bill of exchange" or written and unconditional direction that the bank pay on demand the sum claimed by the State. This was the tenor and effect of the State's letter of February 20, 1980 and the bank's obligation to pay was invoked unless the State's letter was invalidated by the omission to include in *haec verba* the legend now to be discussed.

Each letter of credit directed that the State's drafts be marked "Drawn under Letter of Credit" numbered 140 or 184, according to the credit under which payment was required. The draft presented by the State did not precisely comply with this provision in the letters of credit. Instead, the reference paragraph of the State's draft, addressed to the bank, read as follows:

---

**3.** A "draft" may, within the Code, be either negotiable or non-negotiable, depending upon whether the writing complies with the provisions of § 3.104(a), (b). The Code recognizes that either negotiable or non-negotiable drafts may be used in commercial activities to which the Code applies. For example, in Chapter 4 of the Code, dealing with bank deposits and collections, the term "documentary draft" is defined to mean "any negotiable or non-negotiable draft with accompanying documents, securities or other papers to be delivered against honor of the draft." § 4.104(a)(6).

While it is true that the definition of "draft" set forth in § 3.104(b)(1) does incorporate the attribute of negotiability for the purposes of Chapter 3, dealing with commercial paper, the same definition is not thereby made applicable to other parts of the Code, for example, Chapter 5 dealing with letters of credit. Subsection (c) of § 3.104 makes this explicit:

As used in *other* chapters of this title, and as the context may require, the (word) "draft" ... may refer to instruments which are *not* negotiable within this chapter as well as to instruments which *are* so negotiable.

(emphasis added).

Ref:   St.   Michaels,   Austin—BM 108903
Irrevocable Letters of Credit No. 140 and 184

In *Flagship Cruises, Ltd. v. New England Merchants National Bank*, 569 F.2d 699, 704 (1st Cir., 1978), the court discussed a similar deviation in the legend required by a letter of credit to be included on a demand for payment on the credit.

> The draft named Merchants [the issuer] and, immediately thereunder, identified "No. 18506". We have no difficulty in saying that this is compliance with the requirement that a draft be marked: "Drawn under NEMNB Credit No. 18506". We say this because we cannot see how the form actually used could be interpreted in any other way.

By express reference in the same paragraph, the Court observed:

> We do not see this kind of interpretation as relaxing the strict construction approach to letters of credit but rather as equating a literal requirement for its functional equal.

*Id.*, at page 703. In similar fashion, we do not see how the reference paragraph of the State's draft could be interpreted in any way other than its being "drawn under" the letters of credit to which it refers by number, and such deviations are not violative of the rule of strict compliance.

We overrule the bank's points of error and affirm the judgment of the trial court.

Affirmed.