NEW BRAUNFELS NATIONAL BANK, et al., Appellants,

v.

James T. ODIORNE, Receiver of Southern International Insurance Company, Ltd., Appellee.

No. 3–88–297–CV.

Court of Appeals of Texas, Austin.

Nov. 8, 1989.

Second Rehearing Denied Nov. 25, 1989.

Ronald B. Walker, Anderson, Smith, Null & Stofer, Victoria, for New Braunfels Nat. Bank.

Charles Blackley, Goldston, Ponder & Heinrich, Austin, for Peter Bates, Superintendent of Ins., Cayman Islands, British West Indies.

Catherine Fryer, Bickerstaff, Heath & Smiley, Austin, for appellee.

Before POWERS, JONES and SMITH *, JJ.

## ON MOTION FOR REHEARING

JONES, Justice.

The opinion and judgment handed down by this Court on September 20, 1989, are withdrawn, and this opinion is substituted for the earlier one.

This appeal presents the question of how strictly a beneficiary of a letter of credit must comply with a condition of the credit in order to require payment by the issuer. New Braunfels National Bank (Bank) filed this suit (1) to obtain a judgment declaring that it had properly refused to honor a draft on a $250,000 letter of credit it had issued, and (2) to obtain an injunction prohibiting, until the parties' rights under the credit could be determined, the account party from withdrawing its $250,000 certificate of deposit which had been purchased

---

* Before Earl W. Smith, Justice (retired), Third Court of Appeals, sitting by assignment. *See*

Tex.Gov't Code Ann. § 74.003 (1988).

from the Bank to guarantee reimbursement in the event the Bank paid on the credit. Original defendants were (1) P.W. Bates, Superintendent of Insurance, Cayman Islands, British West Indies (Bates), the beneficiary of the letter of credit, and (2) Southern International Insurance Company, Ltd. (Southern), the account party. Bates counterclaimed to recover the amount of the credit from the Bank; Southern counterclaimed to recover the amount of the certificate of deposit. Later substituted in place of Southern was State Board of Insurance Liquidator/Receiver James T. Odiorne (Receiver), the court-appointed receiver for Southern. All parties filed motions for summary judgment. The district court granted the Bank's motion, declaring that it had properly dishonored the draft on the letter of credit, and further granted the Receiver's motion in part, declaring that the Bank had no security interest in the certificate of deposit and a related promissory note held by the Bank was null and void. The Bank appeals from that portion of the judgment pertaining to the CD and promissory note, while Bates appeals from that portion pertaining to the Bank's refusal to pay on the credit. We will reverse and render in part, and reverse and remand in part.

The facts are, in large part, undisputed. To the extent they are disputed, we must of course accept as true the version favorable to the non-movant, and we must indulge every reasonable inference and resolve all doubts in favor of the non-movant. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546 (Tex.1985).

In early 1986 Jerry Goff, Southern's president, acting on behalf of Southern, requested that the Bank issue a $250,000 letter of credit payable to Bates. Southern, an insurance company chartered under the laws of the Cayman Islands, needed the credit to satisfy a regulatory requirement to provide financial security for Southern's policyholders. The Bank finally agreed to issue the credit, but only upon certain conditions, including (1) the execution by Southern of a $250,000 promissory note, (2) assignment to the Bank of a security interest in certain property belonging to South-

ern, and (3) the deposit in the Bank of "compensating balances" of $250,000 against which the Bank could exercise a right of setoff in the event it ever had to fund the letter of credit. Goff agreed to the conditions.

On April 29, 1986, the Bank issued its irrevocable letter of credit number 86–122–S. The "86" represented the year in which the credit was issued; the "122" represented the numerical sequence of all credits ever issued by the Bank, regardless of the year of issuance; the "S" indicated that the credit was a "standby" letter of credit. The only condition for Bates's drawing on the credit was that any draft be marked as follows: "Drawn under New Braunfels National Bank Irrevocable Letter of Credit Number 86–122–S...." The expiry date of the credit was April 29, 1987.

The promissory note, duly executed by Goff on Southern's behalf, was dated April 29, 1986, with the maturity date being "on demand, but if no demand is made, on Apr. 29, 1987." Although the note form did not expressly so state, the promissory note was a contingent note, in the sense that it would not be "booked" by the Bank—and payment from Southern would not be expected—unless the beneficiary actually drew on the letter of credit. Various security agreements were also signed, and Goff purchased a $250,000 certificate of deposit on Southern's behalf. The CD was non-negotiable and stated that it could not be transferred or assigned without the Bank's written consent. The original CD was given to Goff. Goff agreed orally that the funds represented by the CD would not be withdrawn from the Bank, so that they would be subject to "being taken" if the Bank ever had to pay on the credit. In Goff's presence, the loan officer involved in arranging the transaction instructed the certificate-of-deposit department of the Bank not to release the funds without his approval.

One year later, on the morning of April 29, 1987, Clive Harris, a representative of Bates, presented to the president of the Bank a letter of introduction and instruction from Bates, a draft signed by Bates,

and the original letter of credit. After some study and consultation with its lawyers, the Bank refused to honor the draft because the draft's legend referred to "Irrevocable Letter of Credit No. 86–122–*5*" instead of "86–122–*S*." (Emphasis added.) The Bank refused to allow Harris to change the "5" to an "S" without written authorization from Bates. When Bates attempted to wire such authorization, the cable was misdirected and finally arrived—by mail—several days later, after Harris had returned to the Cayman Islands with the original letter of credit. When the error was eventually corrected a week later, the Bank refused to honor the corrected draft on the ground that the credit had expired.

Bates appeals from that portion of the trial court's judgment declaring that the Bank properly dishonored the draft on the letter of credit, complaining that the trial court erred in granting the Bank's motion for summary judgment and in failing to grant his own motion. A letter of credit is an original undertaking by one party to substitute his financial strength for that of another, and involves three separate contracts. The first is between parties to an underlying commercial or other business transaction: an obligor and an obligee; the second contract is between the obligor ("account party") and a bank or other person ("issuer"), whereby the issuer agrees to issue a letter of credit in exchange for the account party's agreement to reimburse the issuer if the credit is drawn on, and often, the payment by the account party of a nonrefundable fee to the issuer; the third contract, represented by the letter of credit itself, is in the nature of an option contract between the issuer and the obligee ("beneficiary"), and provides that the issuer will make payment to the beneficiary upon presentation of a draft and specified documents (a documentary draft) or merely upon presentation of a draft or demand (a clean credit). *Westwind Exploration, Inc. v. Homestate Sav. Ass'n,* 696 S.W.2d 378 (Tex.1985); *Republic Nat'l Bank v. Northwest Nat'l Bank,* 578 S.W.2d 109 (Tex. 1978).

A letter of credit is termed "commercial" when the underlying transaction involves the sale of goods and the credit becomes payable upon the presentation of documents showing that the seller has complied with the sales agreement; a credit is termed "standby" when it functions in a nonsale setting and generally becomes payable upon certification of the obligor's *non*compliance with the underlying agreement. *See Republic Nat'l Bank,* 578 S.W.2d at 113–14.

■ Article 5 of the Uniform Commercial Code provides guiding principles, but not comprehensive rules, for the treatment of credits. *See* Tex.Bus. & Com.Code Ann. §§ 5.101–5.117 (1968 and Supp.1989). With respect to the issuer's duty to the beneficiary, section 5.114(a) of the Code provides simply that "[a]n issuer must honor a draft or demand for payment which complies with the terms of the relevant credit ...," without regard to the facts of the underlying transaction. To enhance the value of credits as a commercial device, and perhaps in recognition of their virtual *sui generis* nature, most courts have required that the beneficiary strictly comply with conditions contained in the credit before an obligation to pay will be imposed on the issuer. *See* J. Dolan, The Law of Letters of Credit ¶ 6.02 (1984). Texas follows the strict compliance rule. *Westwind,* 696 S.W.2d at 381; *Temple–Eastex Inc. v. Addison Bank,* 672 S.W.2d 793 (Tex.1984).

None of the parties in the present case pleaded that the credit was ambiguous; accordingly, whether Bates strictly complied with the terms of the credit is a question of law for the court to decide. *Westwind,* 696 S.W.2d at 381.

Most commentators agree that maintaining the integrity of the strict compliance rule is important to the continued usefulness of letters of credit as a commercial tool. *See, e.g.,* McLaughlin, *On the Periphery of Letter-of-Credit Law: Softening the Rigors of Strict Compliance,* 106 Banking L.J. 4 (1989); Dolan, *Strict Compliance with Letters of Credit: Striking a Fair Balance,* 102 Banking L.J. 18 (1985). That does not mean, however, that strict compliance demands an oppressive perfec-

tionism. For example, one noted commentator has recognized a logical distinction between discrepancies that relate to the business of the underlying transaction and those that relate to the banker's own business:

> The strict-compliance rule rests on the judgment that issuers should not be forced into the position of determining whether a documentary discrepancy is significant. The rule assumes that issuers are not in a position to know whether discrepancies matter to the commercial parties. Nothing in that assumption requires courts to absolve issuers from knowing the significance of discrepancies for their own business; while it is consistent with the strict-compliance rule to say that an issuer should not be charged with knowledge of whether an air bill, rather than an ocean bill, covering computer components is a significant defect, it is not consistent with the rule to say that a bank issuer is absolved from knowing whether the abbreviation of the word "number" to "No." in the legend on a draft is a significant defect. Banks presumably know nothing about the shipment of computer components, but they know a great deal about legends on drafts—legends that credits require, usually because the banks insist on them.

J. Dolan, The Law of Letters of Credit ¶ 6.03, at S6–4 (Supp.1989) (footnotes omitted).

Two cases exemplify defects in legends, which, as far as we can tell, will always be "noncommercial" defects. In *Tosco Corp. v. FDIC*, 723 F.2d 1242 (6th Cir.1983), the credit required that a draft on the credit contain the following legend: "drawn under Bank of Clarksville Letter of Credit Number 105." The bank refused to honor the draft presented by the beneficiary because the legend in the draft (1) added the word "Tennessee" after "Clarksville"; (2) used a lower case "l" in the term "letter of Credit"; and (3) abbreviated "Number" to "No." In *First Bank v. Paris Savings & Loan Association*, 756 S.W.2d 329 (Tex. App.1988, writ denied), the credit required that a draft contain the following legend:

"Drawn under Paris Savings and Loan Association Letter of Credit No. 1033." The bank refused to honor the draft presented because the legend stated: "Drawn under Paris Savings and Loan Association Letter of Credit No. 1033, *dated June 12, 1986, i/a/o $250,000.*" (Emphasis added.) In both cases, the beneficiary prevailed.

Although Professor Dolan forcefully advocates preserving the integrity of the strict compliance rule, he concludes that the fact situations presented by the *Tosco* and *First Bank* cases do not violate the rule:

> The reason for the strict rule is to protect the issuer from having to know the *commercial* impact of a discrepancy in the documents. Under the strict rule, a bank document examiner does not need to judge whether dried grapes are the same as raisins and does not need to know that "C.R.S." stands for coromandel ground nuts. The legend in [*Tosco*] and most such legends are for the issuer's benefit. The legends assist the banker in identifying the credit.

> \* \* \* \* \* \*

> In these cases, it is not asking too much of the document examiner to exercise discretion *as a banker,* even though it is too much to ask a document examiner to exercise discretion on a commercial matter. Any reasonably prudent document examiner would recognize immediately that the discrepancies in question are *de minimis,* and courts should not hesitate to hold that they do not violate the strict-compliance standard.

J. Dolan, The Law of Letters of Credit ¶ 6.04[3], at S6–8, S6–9 (Supp.1989) (emphasis in original) (footnotes omitted).

We think the distinction made by Professor Dolan is a sensible and salutary one. Indeed, although Texas courts have not expressly recognized the distinction in those terms, they seem to have done so implicitly. In virtually every recent case in which the defect was a "commercial" one, the issuer has prevailed. *See Fina Supply, Inc. v. Abilene Nat'l Bank*, 726 S.W.2d 537 (Tex.1987); *Westwind,* 696

S.W.2d 378; *Delta Brands, Inc. v. MBank Dallas, N.A.,* 719 S.W.2d 355 (Tex.App. 1986, writ ref'd n.r.e.). On the other hand, in virtually every recent case in which the defect was a "noncommercial" one, the beneficiary has prevailed. *See Temple–Eastex,* 672 S.W.2d 793; *Employers Mut. Casualty Co. v. Tascosa Nat'l Bank,* 767 S.W.2d 279 (Tex.App.1989, writ denied); *First Bank,* 756 S.W.2d 329; *Willow Bend Nat'l Bank v. Commonwealth Mortgage Corp.,* 722 S.W.2d 12 (Tex.App.1986, writ ref'd n.r.e.); *Travis Bank & Trust v. State,* 660 S.W.2d 851 (Tex.App.1983, no writ).

■ In the present case, the only defect challenged by the Bank was that the required legend stated it was drawn under New Braunfels National Bank Irrevocable Letter of Credit Number "86–122–5" instead of "86–122–S." By itself, this discrepancy might or might not be of significance. (It was undisputed that *none* of the reference numbers for credits issued by the Bank ended with a numeral and that Bank officers had no doubt which credit Bates was attempting to draw on.) Here, however, there was more: the draft in question was accompanied by and attached to the original letter of credit, which naturally had the correct credit number prominently displayed. Accompanying documents may be considered in determining whether the presentment made by the beneficiary has strictly complied with the terms of the credit. *Temple–Eastex,* 672 S.W.2d at 796; *see also American Airlines, Inc. v. FDIC,* 610 F.Supp. 199 (D.Kan.1985) (although draft referred to incorrect letter of credit number, cover letter which accompanied draft and which contained correct number established strict compliance). Considering both the draft and the original credit together, it would be obvious to any bank document examiner, prudent or otherwise, that the discrepancy in the present case was merely a typographical or clerical error and of no possible significance.

■ We therefore sustain Bates's points of error one and three. In so holding, we do not hold that a beneficiary may satisfy noncommercial conditions in a credit by mere "substantial compliance"; we hold only that for such conditions "strict compliance" means something less than absolute, perfect compliance. We make no holding with respect to defects relating to commercial conditions.

The Bank appeals from that portion of the trial court's judgment denying its claim for injunctive relief and declaring that the Bank has no security interest in the $250,000 certificate of deposit and that the contingent promissory note is null and void.

In its point of error two, pertaining to the CD, the Bank asserts two positions: (1) that it satisfied the requirements, contained in Tex.Bus. & Com.Code Ann. § 9.203 (Supp.1989), for a security interest to attach and be enforceable against the debtor, Southern; and (2) that, irrespective of the enforceability of the security interest, it has a common-law right of setoff against the funds represented by the CD in the event it is required to pay Bates under the credit. We will sustain the Bank's point regarding its right of setoff.

■ The summary judgment evidence contains proof that (1) the Bank would never have issued the letter of credit without the deposit by Southern of "compensating balances" in an amount equal to the amount of the credit; (2) the express purpose of the required deposit was so the Bank would have the right to set off against the funds in Southern's account if it ever had to pay on the credit; (3) Southern was given a choice of making the deposit into a savings account or purchasing a CD; (4) Southern's president, Jerry Goff, was made aware of this requirement and the reasons for it, agreed to it, and purchased the $250,000 CD on Southern's behalf; and (5) the Bank, with Goff's acquiescence if not express consent, immediately placed a "hold" on the funds, preventing their withdrawal without the Bank's approval. The Bank argues that these facts give it a right of setoff against the funds represented by the CD if it is determined that Bates's draft on the credit was proper, and therefore it has the right to retain the funds pending a resolution of the letter-of-credit dispute.

In response, the Receiver presents five arguments. First, the Receiver asserts that the Bank did not raise the issue of setoff in its motion for summary judgment and is therefore precluded from raising it on appeal. While it is true that the Bank did not raise setoff in its motion for summary judgment, it did clearly and unequivocally argue its right to setoff in its response to the Receiver's motion for summary judgment. Accordingly, the Bank may raise the issue on appeal. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671 (Tex.1979).

Second, the Receiver argues that the issuer of a credit is entitled to reimbursement from the account party only when it has "duly honored" a draft or demand for payment. Tex.Bus. & Com.Code Ann. § 5.114(c) (1968). The Receiver contends that any payment made by the Bank now would be as damages for wrongful dishonor, not as the honoring of a draft, and would therefore not entitle the Bank to reimbursement. This argument ignores the existence of evidence that the parties had a separate agreement for the Bank to set off against the CD. The existence and scope of such an agreement are the subjects of dispute. On the present record, we cannot say as a matter of law that the parties did not intend to make their agreement broad enough to encompass a payment made by the Bank pursuant to court decree. Accordingly, even assuming that the Bank would have no *statutory* right to reimbursement, the summary judgment evidence does not conclusively show that the Bank has no right of reimbursement pursuant to private agreement.

Third, the Receiver asserts that the Bank has no right to set off against the funds represented by the CD because there is no mutuality of demand between the Bank and Southern, the account party. *See Dallas/Fort Worth Airport Bank v. Dallas Bank & Trust Co.*, 667 S.W.2d 572, 575 (Tex.App.1984, no writ). The Receiver's main argument in this regard is the alleged absence of a statutory right to reimbursement. As discussed above, we reject this argument. In addition, however, the Receiver contends that the Bank has no right

to demand payment pursuant to the promissory note because, as declared by the trial court, it is null and void. The validity of the promissory note or any security interest is immaterial to the enforceability of an agreement to maintain account balances against which the Bank could exercise its right of setoff. Chapter 9 of the Uniform Commercial Code does not apply to any right of setoff. *First Nat'l Bank v. Lone Star Life Ins. Co.*, 529 S.W.2d 67 (Tex. 1975); Tex.Bus. & Com.Code Ann. § 9.104(9) (Supp.1989). Again, there is evidence that supports the existence of a separate agreement to leave the funds on deposit so that they would be available for the Bank to set off against if that became necessary. Accordingly, even assuming the invalidity of the promissory note, the summary judgment evidence does not conclusively show a lack of mutuality which would prevent a setoff.

Fourth, the Receiver again asserts a lack of mutuality by contending that, as a result of the receivership, the funds no longer belong to Southern. It is true that, under the Insurance Code, title to "all property, contracts, and rights of action" of the insurer are vested in the Receiver as of the date of entry of the receivership order. Tex.Ins.Code Ann. art. 21.28 § 2(b) (Supp. 1989). However, section 3(f) of article 21.-28, relating to claims, expressly provides for offsets "[i]n all cases of mutual debts or mutual credits between the *insurer* and another person." (Emphasis added.) We conclude that the legislature did not intend for the Insurance Code to destroy the common-law right of offset simply because a receiver had become the successor-in-title to the property of the insurer. A receiver takes the insurer's property subject to the rights and equities of third persons. *First Southern Properties, Inc. v. Vallone*, 533 S.W.2d 339, 343 (Tex.1976); *Gibbs v. Wheeler*, 306 S.W.2d 929, 933 (Tex.Civ.App. 1957, writ ref'd n.r.e.).

Finally, the Receiver asserts that he is already in receipt of the funds represented by the CD, so there is nothing left against which the Bank could set off Southern's debt. The record before this Court con-

tains nothing indicating that the Bank has turned the funds over to the Receiver. During oral argument, counsel for the parties alluded to an "agreement" whereby the Receiver had been allowed to take possession of the funds. Although the details of the agreement were not disclosed, the implication was that if the Bank ultimately lost on the letter-of-credit issue and prevailed on the setoff issue, the funds would be returned to it. In the absence of any indication in the record to the contrary, we will assume that the agreement between the parties preserved the vitality of the controversy.

■ A certificate of deposit representing a general deposit is subject to a setoff for a debt owed by the depositor. *Texas Bank & Trust Co. v. Spur Sec. Bank*, 705 S.W.2d 349 (Tex.App.1986, no writ). We can find no reason why a bank customer cannot make an oral agreement to leave funds on deposit for some length of time. None of the Receiver's arguments persuade us that such an agreement by Southern would not be enforceable. The questions of the existence and scope of any agreement in this case are for the trier of fact. We sustain the Bank's point of error two, relating to the CD.

The Bank's point of error one complains of the trial court's declaration that the promissory note is null and void. The trial court's judgment does not recite the reasons behind this holding. However, in his motion for summary judgment, the Receiver contended that, because the Bank had not funded the note by the maturity date, there was no consideration for Southern's promise to pay. We disagree.

■ In light of the agreed contingency that no payment would be expected from Southern unless Bates drew on the letter of credit, the promissory note represented an aleatory promise. *See* 3A Corbin on Contracts §§ 728–738 (1960). That fact, however, did not render the note void or without consideration. 3A Corbin, *supra* § 737; Restatement (Second) of Contracts § 76 comment c (1981). Moreover, the summary judgment evidence does not conclusively show any agreement that the note

would become void if the maturity date was reached before Bates drew on the credit. In the absence of demand for payment, the passing of the maturity date was simply another condition precedent—albeit one involving an event that was certain rather than fortuitous—to Southern's legal duty to pay on the note. We sustain the Bank's point of error one, relating to the promissory note.

In summary, with respect to Bates's appeal regarding the Bank's refusal to honor the draft on the letter of credit, we hold that the summary judgment evidence shows as a matter of law that Bates's presentment strictly complied with the terms of the letter of credit. Accordingly, we will render judgment in favor of Bates, which is the judgment that the trial court should have rendered. *Tobin v. Garcia*, 316 S.W.2d 396 (Tex.1958). However, with respect to the Bank's appeal regarding its rights in the CD and the validity of the promissory note, the Bank did not move for summary judgment on those issues. Consequently, we must remand that portion of the cause to the trial court.

■ The judgment of the trial court declaring that the Bank properly dishonored the draft on the letter of credit is reversed, and we here render judgment that Bates recover from the Bank the sum of $250,-000, plus prejudgment interest at the rate of ten percent per annum from April 29, 1987, to the date of judgment, post-judgment interest at the rate of ten percent per annum from the date of judgment until paid, and all costs of court. In addition, in his motion for summary judgment Bates prayed for a recovery of attorney's fees and submitted an affidavit from his attorney that the reasonable and necessary fees for handling the case were $12,500. The affidavit meets the standard set forth in Rule 166a(c), Tex.R.Civ.P. In the absence of any evidence controverting that affidavit, we are authorized to award Bates his attorney's fees as part of the judgment the trial court should have rendered. *See Tesoro Petroleum Corp. v. Coastal Ref. & Mktg., Inc.*, 754 S.W.2d 764 (Tex.App.1988, writ denied). Accordingly, we also here

render judgment that Bates recover from the Bank reasonable attorney's fees in the amount of $12,500.

The judgment of the trial court pertaining to the $250,000 CD and promissory note is reversed, and that portion of the cause is remanded for further proceedings.