

# THE ATTORNEY GENERAL
## OF TEXAS

JIM MATTOX
ATTORNEY GENERAL

November 13, 1990

Honorable John J. Gavin
Chairman
Insurance Committee
Texas House of Representatives
P. O. Box 2910
Austin, Texas    78769-2910

Opinion No.   JM-1245

Re:  Whether an individual surety may file a letter of credit for bail bond purposes under article 2372p-3, V.T.C.S.    (RQ-1966)

Dear Representative Gavin:

You ask whether an individual applicant for a license to execute bail bonds may satisfy the financial security requirements of article 2372p-3, V.T.C.S, by submitting a letter of credit. Subsection 6(f)(1) of article 2372p-3 provides in part:

> (F)  Upon notice from the [county bail bond] board that the application has been tentatively approved, the <u>applicant</u> shall then:  (1) deposit with the county treasurer of the county in which the license is to be issued a cashier's check, certificate of deposit, cash, or <u>cash equivalent in the amount</u> indicated by the <u>applicant</u> under Subdivision (5) of Subsection (a) of Section 6 of this Act but in no event less than $50,000 except in counties with populations of less than 250,000 persons by the most recent federal census, the amount for applicants in said counties shall be $10,000 to be held in a special fund to be called the bail security fund.  (Emphasis added.)[1]

---

1.  Section 6(a) describes the information that must be included in the application.  Section 6(a)(5) requires the applicant to include a statement of "the amount of cash or cash value of any certificate of deposit or cashier's checks which the applicant intends to place on deposit . . . if the license is granted."  Instead of complying with section
(Footnote Continued)

We conclude that an individual as well as corporate applicants may submit certain letters of credit as "cash equivalents." To qualify, the letters of credit must be irrevocable, must limit inquiry into the underlying transactions between the county and the bondsman, must provide for payment thereunder on sight or within a reasonably brief period of time after presentation of all required documents, and must not make such payment contingent upon the consent of, or any other action by, the bondsman or other party.

Article 6252p-3 does not define the word "applicant." Section 6(a), however, requires "any person desiring to act as a bondsman" to file an application for a license. "Person" is defined by section 2(1) of the act to mean an individual or corporation. Consequently an applicant may be either an individual or a corporation who desires to act as a bondsman. Since the financial security requirements of section 6(f)(1) and (2) of article 6272p-3 apply to any applicant whose application has been tentatively approved, they apply to both individual and corporate applicants.[2]

Article 6252p-3 also does not define "cash equivalent." The statute as originally enacted in 1973 did not contain that phrase. Section 6(d)(1) of the 1973 act required the applicant upon tentative approval of his application to deposit either "a cashier's check, certificate of deposit, or cash in the amount of $5,000," or execute in trust a deed to nonexempt realty worth at least $10,000. Acts 1973, 63rd

---

(Footnote Continued)
6(f)(1), an applicant may satisfy the requirements of section 6(f)(2) and execute in trust a deed to nonexempt realty equal in value to the applicable minimum described in section 6(f)(1).

2. This conclusion is consistent with the cases applying the financial security requirements in section 6 as originally enacted and later amended to both individual and corporate applicants. See, e.g., Texas Fire & Casualty Co. v. Harris County Bail Bond Bd., 684 S.W.2d 177 (Tex. App. - Houston [14th Dist.] 1984, writ ref'd n.r.e.) (local rule invalid to extent that it requires corporate surety to deposit pursuant to section 6(f) of 1981 act more than $5,000); Bexar County Bail Bond Bd. v. Deckard, 604 S.W.2d 214 (Tex. Civ. App. - San Antonio 1980, no writ) (individual surety is not required by section 6(d) of 1973 act to deposit more than $5,000). Compare Attorney General Opinion JM-799 (1987) (section 7(a) of the act expressly makes section 6(g) inapplicable to corporate sureties).

Leg., ch. 550, § 6, at 1523.[3] The 1973 act was substantially amended by the legislature in 1981. Acts 1981, 67th Leg., ch. 312, § 1, at 875-85. The 1981 amendments added section 6(a)(5), renumbered section 6(d)(1) as 6(f)(1), and amended the renumbered provision to include the phrase "cash equivalent" and the reference to subsection 6(a)(5). Neither the testimony at the legislative hearings nor the bill analyses clarify this amendatory language.[4]

In Attorney General Opinion JM-935 (1988), we construed the phrase "cash equivalent" to "be something commercially as good as cash, or, as we take it, something that could readily be converted into cash at a fixed price." Id. at 2 (quoting from Kellogg v. Muller, 4 S.W. 361 (Tex. 1887)). We further described "cash equivalent" in that opinion as an instrument convertible into cash within a reasonable time and with reasonable effort. Id. at 3. Applying those definitions, we noted that an assignment of a life insurance policy without transfer of the power to surrender the policy for its cash value would require the county to obtain the

---

3. In 1987 the legislature increased the minimum cash or cash equivalent amount required by section 6(f)(1) from $5,000 to $10,000 or $50,000 depending on the population of the county. Acts 1987, 70th Leg., ch. 921, § 2, at 3110.

4. The 1981 amendments also added section 6(f)(3), which requires a corporate bondsman to furnish the county sheriff an irrevocable letter of credit as a cash equivalent to satisfy any final judgment of forfeiture. The legislative history is silent with regard to this addition. Article 22.14 of the Code of Criminal Procedure makes a judgment in a bond forfeiture case final after a trial during which insufficient cause is shown for the principal's failure to appear. The section 6(f)(3) requirement applies after the issuance of bonds in contrast to the financial security requirements of section 6(f)(1) and (2), which must be satisfied upon tentative approval of the application to issue bonds. Thus we interpret section 6(f)(3) as an additional financial requirement on corporate bondsmen rather than as an indication that individual bondsmen may not use letters of credit to satisfy section 6(f)(1).

bondsman's express consent to surrender and concluded that such a limited assignment did not constitute a "cash equivalent."[5]

No other opinion or judicial decision affords us insight into the meaning of "cash equivalent." However, in Attorney General Opinion H-430 (1974), which interpreted the 1973 version of the statute, we stated the purpose of the financial security requirements to be the placement of "resources in the hands of the County with which to satisfy a forfeiture without having to resort to court proceedings." Id. at 2 (holding that certificate of deposit, whether or not negotiable, must be payable to the county so that it could be reduced to cash without any action by the bail bondsman). In Attorney General Opinion JM-935, we confirmed this earlier interpretation of the statute's purpose by denying a bail bondsman the right to submit as financial security an instrument that required action on the bondsman's part prior to conversion of the instrument into cash.

---

5. Our holding in Attorney General Opinion JM-935 (1988) is consistent with the cardinal rule of construction that effect be given to every part of a statute. See 67 Tex. Jur. 3d Statutes § 124. We did not therein restrict the phrase "cash equivalent" to the security devices listed in section 6(a)(5) of the act: cash, cashier's checks, and certificates of deposit. The legislature included the phrase "cash equivalent" along with all three of those devices in section 6(f)(1), and thereby indicated its intent not to restrict the submission of security devices to those listed in section 6(a)(5). Thus we give little weight to the omission of the phrase "cash equivalent" in section 6(a)(5) and construe that section as requiring an applicant to describe in his application the amount and type of qualifying security that he will submit on tentative approval of his application. This will achieve the purpose of providing the financial security information that the board needs to assess the qualifications of the applicant without restricting the type of security in a manner that violates the intent of section 6(f)(1).

Section 5.103(a)(1) of the Texas Business and Commerce Code defines "letter of credit" for purposes of chapter 5 of the code[6] concerning letters of credit as

> an engagement by a bank or other person made at the request of a customer and of a kind within the scope of this chapter (Section 5.102) that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit. A credit may be either revocable or irrevocable.

Section 5.102 states that chapter 5 applies to the following: (1) a letter of credit issued by a bank if the credit requires a documentary draft or documentary demand[7] for payment, (2) a letter of credit issued by a person other than a bank if the credit requires that the demand for payment be accompanied by a document of title, or (3) a letter of credit issued by a bank or other person if the credit states that it is a letter of credit or is conspicuously entitled as such.

---

6. Your request does not refer to chapter 5 of the Texas Business and Commerce Code. We limit our opinion, however, to letters of credit within the scope of chapter 5, since chapter 5 establishes the framework for development of the law of letters of credit by codifying the fundamental concepts underlying letters of credit. See Bus. & Com. Code § 5.102(c), comment 2 (Tex. UCC) (Vernon 1968); see also BA Commercial Corp. v. Hynutek, Inc., 705 S.W.2d 713, 715 (Tex. App. - Dallas 1986, no writ) (instrument outside the scope of chapter 5 cannot be a letter of credit).

7. A "documentary draft" or "documentary demand for payment" refers to a draft or demand whose honor is conditioned upon the presentation of any paper including a notice of default, invoice, or document of title. Bus. & Com. Code § 5.103(a)(2). A draft refers to a bill of exchange. Id. § 3.104(b)(1), (c); see Travis Bank & Trust v. State, 660 S.W.2d 851, 855 (Tex. App. - Austin 1983, no writ) (bill of exchange is any written requirement for payment of a specified sum to a third person at a stated time or on demand); see also Black's Law Dictionary 149 (5th ed. 1979) (bill of exchange is a third party instrument by one party ordering payment by another party of a sum certain to a third party).

Letters of credit have traditionally been used as security devices in international sales transactions. Foreign sellers in those transactions ensured payment by requiring their buyers to obtain letters of credit authorizing draws against the credits upon presentation of documents of title such as bills of lading. See East Girard Sav. Ass'n v. Citizens Nat'l Bank & Trust, 593 F.2d 598 (5th Cir. 1979); Annot., 35 A.L.R.3d 1404 (1971). Traditional sales credits are often referred to as "commercial credits." Letters of credit in recent years have also been used to secure the payment of various financial obligations or the performance of real estate, construction, or other nonsales contracts. See Annot., 44 A.L.R.4th 172 (1986); Mueller, Letters of Credit: A New Tool of Trade for the Real Estate Attorney, 38 Baylor L. Rev. 109 (1986) (hereinafter Mueller). These credits are often referred to as "standby credits" or "guaranty credits."

A letter of credit, whether it is a commercial or a standby credit, concerns

> three actors engaged in three related contracts. The three parties . . . are: the customer, which . . . causes it to be issued; the issuer [usually a financial institution], which is the party who executes the credit; and the beneficiary, which is the party entitled to payment pursuant to the credit. Typically, the first contract entered into involves the underlying obligation between the beneficiary and the customer . . . . Pursuant to this underlying obligation, the customer will next contract with the issuer to execute the credit. In performance of the contract with the customer, the issuer executes the credit which embodies the issuer's contract to pay the beneficiary when the beneficiary satisfies the conditions for payment expressed in the letter of credit. (Citations omitted.)

Mueller, supra, at 110-11. These contracts are independent of one another in the case of a true letter of credit. Republic Nat'l Bank of Dallas v. Northwest Nat'l Bank of Fort Worth, 578 S.W.2d 109, 112-15 (Tex. 1978). The issuer acts as a principal and not as the agent of the customer, and it assumes a primary obligation to the beneficiary independent of the performance of the contract between the customer and the beneficiary. The issuer must therefore pay the beneficiary if the beneficiary's demand for payment conforms to the terms of the letter of credit "without reference to the rights and obligations of the parties to

the underlying contract."  Id. at 114; see also Bus. &  Com. Code § 5.114(a); 49 Tex. Jur.  3d Letters of Credit § 1,  at 523.[8]

Conforming presentation requires  that the beneficiary strictly comply with the conditions for payment described in the credit.  Westwind Exploration, Inc. v. Homestate Sav. Ass'n, 696  S.W.2d 378  (Tex. 1985).    The courts,  however, will not construe  mere promises to  be conditions and  will resolve  ambiguities  against  the  issuer.    Furthermore, absolute perfection of  presentation is  not a  requirement. See, e.g., New Braunfels Nat'l  Bank v. Odiorne, 780  S.W.2d 313, 316-17 (Tex. App. -  Austin 1989, writ denied);  Willow Bend Nat'l Bank v.  Commonwealth Mortgage Corp., 722  S.W.2d 12, 14 (Tex. App. - Dallas 1986, writ ref'd n.r.e.).

Either a  commercial or  a standby  credit  may  be  a "documentary" credit, a credit whose terms require that  the draft or  demand for  payment be  accompanied  by  certain documents, or a "clean" credit, a credit whose terms require only the presentation  of the draft  or demand for  payment.

---

8.  Even though  the  issuer  has  a  primary  and  not secondary obligation  to  the beneficiary,  the  issuer  may refuse to honor  a conforming  draft or  demand for  payment under section  5.114(b) of  the Business  and Commerce  Code where there is "fraud in the transaction."  The customer may also seek an injunction against payment by the issuer  where there is such fraud.  Texas courts discussing this exception to payment, have upheld injunctions only if there was  fraud so egregious  that it  destroyed the  legitimate reason  for maintaining the independence of the credit from the  underl-ying obligation.  Paris Sav. & Loan Ass'n v. Walden,  730 S.W.2d 355, 359-64  (Tex. App. -  Dallas 1987, writ  dism'd) (cattle production below  the hoped for  but not  guaranteed quality was unintentional and  did not constitute fraud  for section 5.114 purposes); Philipp Bros., Inc. v.  Oil  Country Specialists, Ltd., 709  S.W.2d  262, 264-65  (Tex.  App.  - Houston [1st  Dist.]  1986,  writ  dism'd)  (beneficiary's intentional shipment  of  totally worthless  pipe  destroyed legitimate  purposes  of  the  credit  and  justified  an injunction); see also Annot., 25 A.L.R.4th 239 (1983)  (many courts including Texas courts refuse to give broad construc-tion to section  5.114).  The  limits of  this exception  to payment may not  be avoided  by an issuer  filing an  inter-pleader action  to determine  the respective  rights of  the beneficiary and the issuer's customer.  Dallas Bank & Trust Co. v. Commonwealth Dev. Corp., 686 S.W.2d 226 (Tex. App.  - Dallas 1984, writ ref'd n.r.e.).

Annot., 44 A.L.R.4th 172, 176 (1986); see also Apex Oil Co. v. Archem Co., 770 F.2d 1353, 1355 (5th Cir. 1985) (a credit may be both "documentary" and "standby"); Gunn-Olson-Stordahl Joint Venture v. Early Bank, 748 S.W.2d 316 (Tex. App. - Eastland 1988, writ denied) (standby credits are often documentary credits since they generally require a statement there has been a default). A commercial or standby credit may also be a "sight" credit under which the beneficiary may demand payment on presentation of a draft and all other conforming documents or a "time" credit that is not payable until a specified time after presentation of all required documents. Mueller, supra, at 116; see also Willow Bend Nat'l Bank, 722 S.W.2d at 12 (draft payable on sight was payable on demand). Letters of credit, however, are not negotiable instruments, although the underlying drafts for payment may be either negotiable or non-negotiable. Heritage Housing Corp. v. Ferguson, 651 S.W.2d 272 (Tex. App. - Dallas 1983, no writ) (since letters of credit are not payable to bearer they are not negotiable); Travis Bank & Trust v. State, 660 S.W.2d 851, 855 (Tex. App. - Austin 1983, no writ) (unless credit otherwise specifies, draft may be either negotiable or nonnegotiable).

Credits may also be either revocable or irrevocable. Bus. & Com. Code § 5.103(a)(1). According to section 5.106(b) of the Business and Commerce Code, once an irrevocable credit is established with regard to the beneficiary it can be modified or revoked only with the beneficiary's consent. A credit is established with regard to a beneficiary when he either receives the credit or an authorized advice of its issuance. Id. § 5.106(a)(2). In contrast, a revocable credit may generally be modified or revoked by the issuer without either notice to or consent from the customer or the beneficiary. Id. § 5.106(c).[9]

Given our review of these fundamental concepts of the law of letters of credit, we conclude that not all letters of credit will satisfy the requirement for "cash

---

9.  Neither section 5.103(a) nor section 5.106 provides which status should be presumed if the credit does not state whether it is revocable or irrevocable. In at least one case concerning an undesignated credit, a court has held a standby credit irrevocable since to do otherwise would frustrate the basic purpose of the credit -- the making certain of the right to payment independent of disputes over the performance of the underlying contract. Mueller, supra, at 117-18 (citing West Virginia Housing Dev. Fund v. Sroka, 415 F.Supp. 1107 (W.D. Pa. 1975)).

equivalents" that they be readily convertible into cash within a reasonable time and with reasonable effort without resort to consent by the bondsman or to other outside action.   To satisfy that requirement and thus constitute a "cash equivalent" for purposes of section 6(f)(1) of article 2372p-3, V.T.C.S., we hold that a standby letter of credit used to secure the bail bond obligations of an individual or corporate bondsman must possess the following charac- teristics:   (1) the credit must be irrevocable, (2) the credit must be a true letter of credit that does not require examination of the performance of the underlying transaction absent "fraud in the transaction," (3) the drafts or demands for payment under the credit must be payable to the county on sight or within a reasonably brief period of time after presentation of all required documents, (4) the credit must not include any condition that makes payment to the county as beneficiary contingent upon the consent of or other action by the bondsman or other party, and (5) the credit must be issued by an institution or entity which is financially responsive in the amount of the credits, in the opinion of the county bail bond board.   However, our conclusion does not foreclose other "cash equivalents" as long as the standards of Attorney General Opinion JM-935 are satisfied.

The credit must be irrevocable to ensure that the issuer does not unilaterally modify or revoke the credit prior to a county's demand for payment under the credit. The three named security devices in section 6(f)(1) -- cash, cashier's checks, and certificates of deposit -- are not revocable; thus qualifying letters of credit must not be revocable. Furthermore, to hold otherwise would not ensure that the necessary resources would be available to satisfy bond forfeitures.

Second, a qualifying credit must be a true letter of credit. A true letter of credit limits the circumstances in which the underlying transactions between the bondsman and the county may be examined. _Republic Nat'l Bank of Dallas_, 578 S.W.2d at 115. If the credit requires as a condition for payment that there be a factual determination of forfei- ture or default, the county would likely have to resort to outside action, such as a court proceeding, to establish its rights to payment under the credit.   Thus even though the credit may require a document[10] be submitted prior to

---

10.   As mentioned earlier, a credit may be either a "documentary" credit or a "clean" letter of credit.   _See_
(Footnote Continued)

payment that states the bondsman has defaulted in his underlying obligations to the county, the credit may not require as a condition for payment proof of default or other examination of the performance of the underlying obligations. See, e.g., Gunn-Olson-Stordahl Joint Venture, 748 S.W.2d 316 (summary judgment reversed on appeal since credit subject to performance in compliance with underlying contract and thus was not true letter of credit but guaranty contract); Summit Ins. Co. of New York v. Central Nat'l Bank of Houston, 624 S.W.2d 222 (Tex. Civ. App. - Houston [1st Dist.] 1981, writ ref'd n.r.e.) (true letter of credit may contain references to underlying obligations but those references may not create conditions for honoring drafts).

Third, drafts or other demands for payment under a qualifying letter of credit must be payable on sight or within a reasonably brief period of time after proper presentation of all required documents so that the credit is readily convertible into cash. What is a reasonable time may vary depending on individual and local circumstances, and we are not in a position to address these varying circumstances as a part of the opinion process. Furthermore, section 6(f)(1) sanctions the use of certificates of deposit without prohibiting the use of time deposits. See Attorney General Opinion H-430 (1974) (on maturity bondsman may withdraw certificate if substitute security is provided). We therefore conclude that county bail bond boards may establish reasonable time periods for payment under letters of credit submitted as "cash equivalents" pursuant to section 6(f)(1) of article 2372p-3.

Finally, the terms of a qualifying letter of credit must not make payment contingent upon any action by the bondsman or other individual or entity. To satisfy this standard, the credit must not include any condition for payment that the county cannot satisfy without the consent of, or other action by, the bondsman or other party. For

---

(Footnote Continued)
infra, at 11. Although a "clean" letter of credit, a credit that requires only a draft or demand for payment, limits the risk that it will be construed as a guaranty, standby credits are frequently documentary credits since the terms of the credits usually require that the draft or demand for payment be accompanied by a statement that the customer is in default. A cautious beneficiary can limit his risk by avoiding any reference to guaranties and unnecessary reference to the underlying obligations. See Mueller, supra, at 113 n.22 (various advice to cautious beneficiaries).

instance, the credit may not require the county as beneficiary to submit a document signed by the bondsman that he has defaulted on his underlying obligations to the county. Neither the terms of a cashier's check or certificate of deposit payable to the county requires consent of or other action by anyone else prior to conversion into cash. Thus, the terms of a qualifying letter of credit must not condition payment on such consent or action.

## S U M M A R Y

Individual as well as corporate applicants may submit certain letters of credit as "cash equivalents" for purposes of section 6(f)(1) of article 2372p-3, V.T.C.S. To qualify as "cash equivalents," letters of credit must be irrevocable, must limit inquiry into the underlying transactions between the county and the bondsman, must provide for payment of drafts or demands for payment thereunder on sight or within a reasonably brief period of time after presentation of all required documents, and must not make payment contingent upon the consent of, or other action by, the bondsman or other party.

Very truly yours,

JIM MATTOX
Attorney General of Texas

MARY KELLER
First Assistant Attorney General

LOU MCCREARY
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY
Special Assistant Attorney General

RENEA HICKS
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Celeste A. Baker
Assistant Attorney General