# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 8, 2014

No. 12-10822

Lyle W. Cayce
Clerk

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff

v.

STANFORD INTERNATIONAL BANK, LTD, ET AL,

Defendants

TRUSTMARK NATIONAL BANK,

Intervenor-Appellant

v.

RALPH S. JANVEY,

Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:09-CV-298

Before WIENER, DENNIS, and OWEN, Circuit Judges.

PER CURIAM:[*]

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-10822

As we stated the last time intervenor-appellant Trustmark National Bank ("Trustmark") appeared before us in connection with this matter, "[t]his is one of many cases stemming from the purported Stanford Financial Ponzi scheme." *SEC v. Stanford Int'l Bank, Ltd.* ("*Trustmark I*"), 465 F. App'x 316, 317 (5th Cir. 2012) (per curiam) (unpublished). By way of general background, we have several times explained that these cases

> arise[] out of an alleged multi-billion-dollar Ponzi scheme perpetrated by the Stanford companies ("Stanford"), a network of some 130 entities in 14 countries controlled by R. Allen Stanford. According to the SEC, the companies' core objective was to sell certificates of deposit ("CD's") issued by Stanford International Bank Limited in Antigua ("Stanford Bank"). Stanford achieved and maintained a high volume of CD sales by promising above-market returns and falsely assuring investors that the CDs were backed by safe, liquid investments. For almost 15 years, the Bank represented that it consistently earned high returns on its investment of CD sales proceeds, ranging from 12.7% in 2007 to 13.93% in 1994. In fact, however, the Bank had to use new CD sales proceeds to make interest and redemption payments on pre-existing CDs, because it did not have sufficient assets, reserves and investments to cover its liabilities.

*Id.* at 318 (quoting *Janvey v. Adams*, 588 F.3d 831, 833 (5th Cir. 2009)).

The roots of the present appeal are in Trustmark's "issu[ance] [of] letters of credit to several companies conducting business with Stanford." *Id.* Relevant here, Trustmark issued a letter of credit dated November 1, 2007 to HP Financial Services Venezuela ("HPFS") in the amount of $1,986,745 in connection with HPFS's lease of computer equipment to Stanford. Trustmark's liability on the letter of credit was secured by issuing a CD to Stanford and Stanford placing cash collateral in a Trustmark deposit account. *Id.* HPFS intervened in the underlying SEC action "to clarify whether the Receivership Order enjoins or otherwise applies to draws under letters of credit issued by Trustmark." *Id.* Thereafter, Trustmark intervened to seek "'an order modifying,

No. 12-10822

clarifying, or enforcing [the Receivership Order] as necessary to grant Trustmark authority to exercise its rights as a secured creditor' and 'authority under . . . the [Receivership Order] to exercise its set-off rights against cash collateral.'" *Id.* at 318-19 (first and third alterations in original). "[T]he district court allow[ed] [HPFS] to present [the] letter of credit to Trustmark for payment, but refus[ed] to allow Trustmark to offset the funds from Stanford who is currently under the receivership of Ralph S. Janvey ('Janvey' or 'the Receiver[]')." *Id.* at 317.

We affirmed, holding that "the conclusion reached by the district court [was] correct" because "the tripartite nature of letter of credit transactions required Trustmark to pay HPFS with Trustmark funds, not Receivership funds." *Id.* at 320 (citing *In re Compton Corp.*, 831 F.2d 586, 589 (5th Cir. 1987)). We reasoned that "honoring the letter of credit is exactly the position Trustmark put itself in by issuing the letter of credit in the first place." *Id.* We further stated:

> Trustmark may resent this ruling since it requires it to pay immediately, while requiring it to enter into a more contorted process for satisfying its secured claim. This, however, is the nature of receivership and does not prevent it from seeking a settlement with the Receiver to avoid that potentially lengthy process. Nor does it necessarily dictate the outcome of any future claims Trustmark might have since this ruling is strictly limited to the facts of this case as they stand at this time in the receivership process.

*Id.* at 321.

Subsequent to our decision in *Trustmark I*, the Receiver on April 17, 2012 moved the district court to order Trustmark to deliver the cash collateral in the deposit account to the Receiver. On July 24, 2012, the district court granted the Receiver's motion and "order[ed] Trustmark to turnover [sic] the contents of the Account to the Receiver within seven (7) days." However, Trustmark instead

moved the district court on July 31 to modify its order so as to permit Trustmark to tender the funds to the district court registry rather than to the Receiver. On August 9, the district court issued an order denying that motion and further advising Trustmark that "[b]ecause Trustmark has failed to comply with the Court's Turnover Order, [the Court] [will] fine[] Trustmark $1,000.00 for each day it delays payment beginning the day after the date of this Order, that fine doubling each day thereafter." That same day, Trustmark filed a notice of appeal as to these orders. Trustmark ultimately complied with the turnover order on August 13, 2012 and paid $15,000 in fines pursuant to the contempt order.

In this appeal, Trustmark principally argues that the district court's entry of the turnover order prior to the effectuation of a "secured claims distribution plan" constituted a deprivation of due process by "destroy[ing]" Trustmark's purportedly perfected secured creditor status without sufficient procedural safeguards.[1] Trustmark also argues that the turnover order violates 12 U.S.C. § 91, which prohibits state courts from issuing an "attachment, injunction, or execution" against a national bank "before final judgment." For the following reasons, we affirm the orders of the district court.

We first address Trustmark's procedural due process argument. Trustmark frames its argument as raising the question of "whether [the] district court[,] sitting . . . in equity, has the power to deprive [Trustmark] of its security in the pursuit of the broader interests of recouping funds to repay Stanford's

---

[1] Trustmark contends that "[i]t is undiputed that Trustmark has a properly perfected security interest in the Deposit Account." In fact, the Receiver does dispute this, asserting that "[it] has never conceded and no court has ever held that Trustmark has a valid security interest in the cash collateral"; and that "[b]ecause the cash collateral consists of proceeds from the sale of fraudulent CDs, Stanford Venezuela could not have transferred a valid security interest in that collateral to Trustmark." For purposes of this appeal, we assume without deciding that Trustmark has the security interest it claims. *Cf. Trustmark I*, 465 F. App'x at 318 ("By issuing [letters of credit], Trustmark became a secured creditor with set-off rights against cash collateral that Stanford had placed on deposit with Trustmark.").

No. 12-10822

'putative victims' (*i.e.*, unsecured creditors)." Trustmark contends that eventual participation in the Stanford receivership claims distribution process does not "constitute an adequate substitute for the immediate seizure of Trustmark's secured property interest," at least "until such time as a secured claims distribution plan has been proposed by the Stanford Receiver and finally approved by the District Court." Trustmark asks this court to "direct[] the Receiver to return the secured funds to Trustmark or post adequate substitute security for the taking of the Secured Funds." We conclude that Trustmark has failed to demonstrate a violation of procedural due process.

"The Supreme Court has adopted a two-step analysis to examine whether an individual's procedural due process rights have been violated. The first question 'asks whether there exists a liberty or property interest which has been interfered with by the [government]; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'" *Meza v. Livingstone*, 607 F.3d 392, 399 (5th Cir. 2010). "Three factors are considered in identifying the process that is due: (1) the private interest affected, (2) the risk of an erroneous deprivation with the process supplied, and (3) the government's interests." *Wilson v. Birnberg*, 667 F.3d 591, 601 (5th Cir. 2012).

This court has already affirmed that the funds Trustmark turned over to the Receiver were Stanford property and thus properly part of the receivership estate. *Trustmark I*, 465 F. App'x at 320-21. Accordingly, the turnover order did not effect any deprivation from Trustmark as to those funds, and Trustmark does not argue otherwise. Instead, Trustmark contends that its security interest in the deposit funds constitutes a due process property interest, distinct from the underlying Stanford funds, that has been "destroy[ed]" by the turnover order. Trustmark acknowledges that this court has not previously addressed the question of whether a bank's security interest in cash collateral on deposit constitutes a property interest for procedural due process purposes, and we need

5

not decide that question in this appeal. Rather, assuming that Trustmark's security interest is property within the meaning of the Due Process Clause of the Fifth Amendment, we conclude that Trustmark has failed to "demonstrate that the '[district court] has deprived [it]" of that interest." *See Wilson*, 667 F.3d at 601.

As Trustmark itself repeatedly states in its briefing, it is well established that "a receiver appointed by a federal court takes property *subject to all liens, priorities, or privileges* existing or accruing under the laws of the state." *Marshall v. New York*, 254 U.S. 380, 385 (1920) (emphasis added). Trustmark urges that this principle — repeatedly reaffirmed by subsequent courts[2] — exposes a constitutional infirmity in the district court's orders. To the contrary, we agree with Janvey that, as "a receiver appointed by a federal court," his receipt of the Stanford funds formerly on deposit with Trustmark is subject to whatever pre-existing security interest Trustmark may have therein. *See id.* Indeed, Trustmark acknowledges that "[t]he Receiver took all of Stanford's claims, including its Certificate of Deposit here, 'subject to all liens, priorities, or privileges existing . . . under state laws.'" (quoting *Marshall*, 254 U.S. at 385). In short, the very authorities that Trustmark cites in support of its argument that the Turnover Order "destroy[ed]" its security interest are directly contrary to that proposition.

"The Receiver's task to 'marshal, preserve and conserve the receivership estate is as much for [Trustmark's] benefit as for the benefit of [Stanford's] other

---

[2] *See SEC v. Credit Bancorp, Ltd.*, 386 F.3d 438, 446 (2d Cir. 2004) ("[A] federal court receiver takes property subject to a perfected lien or other established priority right."); *Lankenau v. Coggeshall & Hicks*, 350 F.2d 61, 66-67 (2d Cir. 1965) ("Assuming that [creditor]'s attachment efforts were sufficiently perfected under the circumstances under state law to create some kind of lien or priority rights in their favor, appointment of a federal court receiver under orders to take charge of all of [the] property [of the defendant in the underlying SEC action] does not destroy those rights. The receiver takes custody of the property subject to any rights previously acquired by the attachment." (citation omitted)).

investors." *Trustmark I*, 465 F. App'x at 321 (first alteration in original) (quoting *SEC v. Stanford Int'l Bank Ltd.*, 424 F. App'x 338, 341 (5th Cir. 2011)). In the receivership claims process, Trustmark will have the opportunity to "advis[e] the receiver and the court as to . . . the basis of [its] claim to . . . priority." *See Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt.*, 725 F.2d 584, 586 (10th Cir. 1984) (quoting Ralph Ewing Clark, A Treatise on the Law and Practice of Receivers § 541(a) (3d ed. 1959)). Given the considerable scope of the alleged Stanford Ponzi scheme, the receivership process here may be "lengthy." *Trustmark I*, 465 F. App'x at 321. "This, however, is the nature of receivership." *Id.*

Second, Trustmark briefly contends that 12 U.S.C. § 91 precludes enforcement of the Turnover Order. Section 91 provides in pertinent part that "no attachment, injunction, or execution, shall be issued against [a national bank] or its property before final judgment in any suit, action, or proceeding, in any State, county, or municipal court." 12 U.S.C. § 91. Trustmark contends that the turnover order amounts to an "injunction" against a national bank "before final judgment" in violation of the statute. *See id.* Further, although the statute by its terms applies only to state court actions, Trustmark argues that "the Supreme Court [has] held that Section 91 applies 'as well on the courts of the United States.'" (quoting *Pac. Nat'l Bank v. Mixter*, 124 U.S. 721 (1888)).

However, Trustmark's reliance on *Mixter* is misplaced. The Supreme Court has since clarified that § 91's "anti-injunction provision . . . was meant to have a limited scope" and "that Congress intended only to prevent *state* judicial action, prior to final judgment, which would have the effect of seizing *the bank's property*," as contrasted with "property belonging to others which happens to be in the hands of the bank." *Third Nat'l Bank in Nashville v. Impac Ltd., Inc.*, 432 U.S. 312, 322-23 (1977) (emphasis added); *see also id.* at 324 ("[T]he statute merely prevents prejudgment seizure of bank property by creditors of the

No. 12-10822

bank."). The district court's order requiring Trustmark, as Stanford's creditor, to turn over receivership estate assets to the appointed receiver in this SEC action does not fall within the "limited scope" of § 91. *See id.* at 322. It does not constitute either "state judicial action," *see id.*, or a "seizure of bank property by creditors of the bank," *see id.* at 324. Accordingly, the turnover order does not violate 12 U.S.C. § 91.[3]

Accordingly, we affirm the challenged orders of the district court.

---

[3] Trustmark also contends, albeit in conclusory fashion, that the district court abused its discretion by holding Trustmark in contempt because Trustmark's offer to pay the funds into the district court's registry constituted a "good faith effort[] to comply with the Turnover Order." Trustmark waived this argument by failing to cite any authority in its appellate brief. *See United States v. Demmitt*, 706 F.3d 665, 670 (5th Cir. 2013); Fed. R. App. P. 28(a)(9). Moreover, Trustmark's argument would fail even were it adequately briefed. "We review contempt orders and sanctions imposed thereunder for an abuse of discretion." *Whitcraft v. Brown*, 570 F.3d 268, 271 (5th Cir. 2009). "A party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995). The terms of the turnover and contempt orders were definite and specific, and Trustmark failed to comply with their clear requirements. "[G]ood faith is not a defense to a civil contempt order[] . . . ." *Whitcraft*, 570 F.3d at 272.