# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 20, 2024

Lyle W. Cayce
Clerk

———————

No. 22-10235

———————

RALPH S. JANVEY, *in his Capacity as Court-Appointed Receiver for* THE STANFORD INTERNATIONAL BANK LIMITED, *et al.*,

*Plaintiff—Appellee*,

*versus*

GMAG, L.L.C.; MAGNESS SECURITIES, L.L.C.; GARY D. MAGNESS; MANGO FIVE FAMILY INCORPORATED, *in its Capacity as Trustee for* THE GARY D. MAGNESS IRREVOCABLE TRUST,

*Defendants—Appellants*,

CONSOLIDATED WITH

———————

No. 22-10429

———————

SECURITIES AND EXCHANGE COMMISSION, *et al.*,

*Plaintiffs*,

*versus*

GMAG, L.L.C.; GARY D. MAGNESS IRREVOCABLE TRUST; GARY D. MAGNESS; MAGNESS SECURITIES, L.L.C.,

*Defendants—Appellants*,

*versus*

RALPH S. JANVEY,

*Appellee*.

_____

Appeals from the United States District Court
for the Northern District of Texas
USDC Nos. 3:15-CV-401, 3:09-CV-298

_____

ON PETITION FOR REHEARING EN BANC

Before STEWART, DENNIS, and SOUTHWICK, *Circuit Judges*.

LESLIE H. SOUTHWICK, *Circuit Judge*:

No judge in regular active service requested the court be polled on rehearing *en banc*; therefore, the petition for rehearing *en banc* is DENIED. Treating the petition for rehearing *en banc* as a petition for panel rehearing, the petition is GRANTED. We withdraw our opinion, *Janvey v. GMAG, L.L.C.*, 69 F.4th 259 (5th Cir. 2023), and substitute the following.

In 2009, Stanford International Bank ("SIB") was exposed as a Ponzi scheme and placed into receivership. The Receiver sought to recover estate assets from various parties including Gary Magness and some of his affiliates. The district court refused to consider a setoff that would have reduced the Receiver's judgment against Magness, concluding among other reasons that a setoff would be inequitable. We AFFIRM.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2009, the Securities and Exchange Commission ("SEC") exposed the fraudulent operations of SIB. *Janvey v. GMAG, L.L.C.*, 977 F.3d 422, 425 (5th Cir. 2020). For nearly two decades, SIB had issued fraudulent certificates of deposit ("CDs") that paid above-market interest rates. *Id.*

2

No. 22-10235
c/w No. 22-10429

The payments were derived from new investors' funds. *Id.* The scheme ultimately left thousands of investors with $7 billion in losses. *Id.* This court has frequently considered appeals from the receivership.[1] We summarize the facts relevant to this appeal.

Defendants-Appellants are Gary Magness; GMAG, L.L.C.; and several other Magness entities (collectively, "Magness"). Between December 2004 and October 2006, Magness purchased $79 million in SIB-issued CDs. *Id.* After reports that the SEC was investigating SIB, Magness sought to redeem his investments. *Id.* SIB responded that redemptions were not possible but agreed to loan the value of the CDs and an additional amount as a result of accumulated interest. *Id.* In October 2008, through a series of loans, Magness received $88.2 million from SIB. *Id.*

In a 2009 proceeding brought by the SEC, the District Court for the Northern District of Texas appointed Ralph S. Janvey as Receiver to recover SIB's assets and distribute them to the victims. *Id.* We will use both "Janvey" and "the Receiver" in this opinion. The district court entered an order, amended in 2010, restraining creditors from: "The set off of any debt owed by the Receivership Estate or secured by the Receivership Estate assets based on any claim against the Receiver or the Receivership Estate," unless obtaining "prior approval of the Court."

The same 2010 order barred all persons from filing suit against the Receiver on claims "arising from the subject matter of this civil action." In 2012, the district court established a process allowing creditors to file claims against the Receivership and to participate in distributions. The order

---

[1] *See Janvey v. Brown*, 767 F.3d 430 (5th Cir. 2014); *Janvey v. GMAG, L.L.C.*, 913 F.3d 452 (5th Cir.), *vacated & superseded by* 925 F.3d 229 (5th Cir. 2019); *Janvey v. GMAG, L.L.C.*, 977 F.3d 422 (5th Cir. 2020); *Janvey v. GMAG, L.L.C.*, No. 21-10483 c/w 21-10882, 2022 WL 4102067 (5th Cir. Sept. 7, 2022).

No. 22-10235
c/w No. 22-10429

defined "[c]laim" as any "potential or claimed right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, mature, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, against one or more of the Receivership Entities." Magness participated in this court-approved claims process and filed three proofs of claim alleging outstanding balances in his SIB CD accounts. Those claims are the basis for his seeking a setoff.

In a case separate from the underlying Receivership but also brought in the Northern District of Texas, the Receiver sued Magness, alleging the loans he received from SIB were fraudulent transfers and seeking return of those funds. Magness agreed the payments were fraudulent but argued they were taken in good faith under Texas law.

Magness initially included a setoff defense in his answer to the Receiver's complaint. The Receiver moved to exclude any setoff defenses before trial, arguing that any reference to setoff would be "unfairly prejudicial" and "an attempt to side-step the claims process."[2] Later, in a joint stipulation, the parties "agree[d] that during the trial of this matter," they would "not present . . . any reference to the Magness Parties' affirmative defenses of . . . setoff/offset." The district court also entered a pretrial order, which made no mention of any setoff defense.

_____

[2] The Receiver notified the court of a recent opinion holding that a plaintiff forfeits a claim if the only assertion of it in district court was in the complaint. *Shambaugh & Son, L.P. v. Steadfast Ins. Co.*, 91 F.4th 364, 369–70 (5th Cir. 2024). The court also held, though, that usually forfeiture "will not apply 'when [an issue] fairly appears in the record as having been raised or decided.'" *Id.* at 370 (quoting *Lampton v. Diaz*, 639 F.3d 223, 227 n. 14 (5th Cir. 2011)). We conclude that consideration of a setoff was likely not forfeited, in part because, as we discuss, the time for seeking a setoff could be after the other party's claim had been resolved.

No. 22-10235
c/w No. 22-10429

The dispute proceeded to trial. Magness had already returned $8.5 million to the Receiver, which was the amount he was loaned in excess of his original $79 million investment; the only issue for the jury was whether Magness was acting in good faith when he received $79 million in loans from SIB. Jurors found Magness had inquiry notice of the possibility of a Ponzi scheme but also determined any investigation would have been futile. *Janvey*, 977 F.3d at 426.

Based on the jury findings, the district court determined Magness had received the funds in good faith and entered judgment denying the Receiver any recovery. *Id.* Since Magness had no obligation to disgorge funds, setoff was not an issue. On appeal, we certified to the Supreme Court of Texas the question of whether good faith was a defense in these circumstances; the answer was "no." *Id.*; *Janvey v. GMAG, L.L.C.*, 592 S.W.3d 125, 133 (Tex. 2019). In October 2020, we reversed and rendered judgment for the Receiver as to Magness's liability for the $79 million. *Janvey*, 977 F.3d at 431.

Following our decision, the Receiver moved in district court for entry of final judgment for the $79 million. Magness's opposition did not include any reference to a setoff defense. On April 9, 2021, the district court entered final judgment for about $79 million, plus prejudgment interest and costs.

On May 6, 2021, Magness moved in district court for a stay of the final judgment pending (1) his appeal of that final judgment to this court and (2) the Supreme Court's ruling on his petition for a writ of certiorari for review of this court's liability judgment. To obtain that relief, Magness0 agreed to deposit a cash *supersedeas* bond. Magness represented that he would not oppose release of the cash to satisfy the final judgment when no further appeal was possible. On May 11, 2021, the district court granted the requested relief. Magness then petitioned the Supreme Court for a writ of certiorari regarding this court's liability judgment.

No. 22-10235
c/w No. 22-10429

On August 4, 2021, the district court entered final judgment on attorneys' fees. In a consolidated appeal to this court, Magness challenged the district court's award of prejudgment interest, costs, and attorneys' fees. Before our decision on the appeal, the Supreme Court on December 13, 2021, denied Magness's petition to review this court's liability judgment. We later affirmed the district court's award. *Janvey v. GMAG, L.L.C.*, No. 21-10483 c/w 21-10882, 2022 WL 4102067, at *4 (5th Cir. Sept. 7, 2022).

This brings us to the current appeal. After our 2022 decision, the Receiver moved in district court in the separate action he had filed against Magness to release the $79 million from the court registry. Despite his prior representation that he would not oppose the release of funds, Magness moved for leave to file a complaint. Magness's proposed complaint sought declaratory relief that the final judgment for $79 million should be reduced by the amount he was owed on his claims that had not yet been adjudicated. Magness argued the district court should first resolve his setoff claims before releasing any funds. In what we will call the "Initial Setoff Order," the district court denied Magness's motion for leave and granted the Receiver's motion to release funds.

In the main SEC Receivership proceeding, Magness filed a second, nearly identical motion for leave to file his proposed complaint, again seeking a declaratory judgment pertaining to setoff. In the "Second Setoff Order," the district court once again denied leave.

Magness appealed both the Initial and the Second Setoff Order. We consolidated the appeals.

## DISCUSSION

Magness seeks reversal of the district court's denial of a setoff. "We review the district court's actions pursuant to the injunction it issued for an abuse of discretion." *Newby v. Enron Corp.*, 542 F.3d 463, 468 (5th Cir.

6

2008). A district court's actions in supervising an equity receivership are also reviewed for an abuse of discretion. *SEC v. Safety Fin. Serv., Inc.*, 674 F.2d 368, 373 (5th Cir. 1982). Similarly, a district court's denial of leave to amend a complaint is discretionary, reviewed here for possible abuse. *Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 566 (5th Cir. 2003).

### I. Preliminary matters

#### A. Magness's setoff claims and the district court's rulings

In his first proposed amended complaint, Magness sought a declaratory judgment that (1) "the continuation of the stay against setoff in the Appointment Orders is an unconstitutional pre-emption of state law rights of setoff," (2) Magness is "entitled to setoff against the Judgment the balance accrued pursuant to state and/or Antiguan law under certificates of deposits," and (3) Magness is "entitled to setoff against the Judgment any amounts they are entitled to receive as a distribution in the Receivership on account of satisfying the Judgment." Though the motion referred to Antiguan law, no such law is argued here on appeal, making Texas law all we consider.

In its Initial Setoff Order, the district court reasoned that under the mandate rule, it "had no power to do anything other than enter final judgment in conformance with the judgment of the Fifth Circuit." *See Deutsche Bank Nat'l Tr. v. Burke*, 902 F.3d 548, 551 (5th Cir. 2018). Consequently, the court did not consider the merits of Magness's claim of a right to a setoff.

Magness also moved for leave to file a nearly identical complaint in the SEC Receivership proceeding. In its Second Setoff Order, the district court denied that motion on the merits. Later in our opinion, we will discuss the district court's reasons. We will not analyze that court's application of

the mandate rule in the Initial Setoff Order because addressing the arguments for denying leave to amend in the Second Setoff Order will suffice.

On appeal, Magness contends he has setoff rights that "fall into two categories." The first category is the "20% CD Principal Setoff Amount plus accrued interest on that amount."[3] The second category is the "amount of distributions to which [Magness is] entitled as [a] victim[] of SIB."[4]

### B. *Historical federal practice and Texas law on setoffs*

We first need to determine the applicable law. The SEC obtained a receivership over SIB. Had SIB been forced into bankruptcy, setoff rights would have existed statutorily, subject to specific requirements under the Bankruptcy Code and extensive caselaw. *See* 11 U.S.C. § 553. One treatise concluded that there is "no general equitable power to disallow a valid right of setoff preserved by section 553." 5 Collier on Bankruptcy § 553.02[3] (Richard Levin & Henry J. Sommer, eds., 16th ed. 2023). Instead, the rules for general equity receiverships apply here.

A federal statute and a procedural rule identify some of the requirements for a receiver's administration of a debtor's estate. First, the statute provides that a receiver appointed by a federal court "shall manage and

---

[3] Magness claims this setoff amount is $58 million. As described earlier, Magness purchased $79 million in SIB CDs. SIB loaned him $88.2 million, $25 million in early October 2008, and $63.2 million in late October 2008. Magness claims he still has $58 million on deposit with SIB using the following calculation. The $25 million loan was paid off immediately with accrued interest on his CDs. As a result, Magness asserts that he only borrowed $63.2 million, leaving $15.8 million on deposit ($79 million minus $63.2 million). That $15.8 million principal, plus interest and "penalty revers[als]," is the basis of Magness's claim for a $58 million setoff.

[4] Magness argues he is entitled to $11 million in distributions from SIB. Magness alleges the "Estimated Recovery % to SIB Creditors" is 13.8% of the $79 million judgment the district court order released to the Receiver, which results in $11 million.

operate the property in his possession . . . according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof." 28 U.S.C. § 959(b). Second, the Federal Rules of Civil Procedure "govern an action in which the appointment of a receiver is sought or a receiver sues or is sued." Fed. R. Civ. P. 66. This sentence immediately follows: "But the practice in administering an estate by a receiver . . . must accord with the historical practice in federal courts or with a local rule." *Id.*

The line dividing "administration" governed by historical practice or local rule from the "action" governed by the federal rules was analyzed by one of the principal treatises on federal procedure:

> In our opinion "administration" means the receiver's dealings with the property, and the "practice" in such administration refers to orders he must get to allow him to dispose of the property, to spend money to protect it, to distribute it among the creditors or lienors, and the like. In short, the "practice" means the procedure by which he gets the power to do those things which an owner of the property would have without court authorization.

12 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2982 (3d ed. 2023) (quoting *Phelan v. Middle States Oil Corp.*, 210 F.2d 360, 363 (2d Cir. 1954)). The *Phelan* case "indicates the general scope of 'the administration of estates by receivers' to which local practice rules and former equity usage, rather than the federal rules, apply." *Id.* For good or ill, "it is clear from the text of [Rule 66] itself that, in formulating it, the [Rules Advisory] Committee did not wish to undertake a revision of federal receivership practice." § 2981.

Though there is not much law, we accept this treatise's conclusion that a court's "orders [that a receiver] must get to allow him to dispose of

the property, . . . to distribute it among the creditors or lienors, and the like" are part of "administration." *Phelan*, 210 F.2d at 363. The treatise reasonably adds that "[o]ther aspects of a receivership that would be governed by former federal equity practice . . . include . . . his or her powers and discretion with regard to management and disposition of the property, the allowance and payment of claims, and accounting by and compensation of the receiver." 12 Wright & Miller, Fed. Prac. & Proc. § 2982 n.10. The issue before us — whether a receiver may deny a setoff — is at least an "allowance and payment of claims" and may fit other categories.

Therefore, under Rule 66 we are to apply either historical practice in federal court (not the Federal Rules of Civil Procedure) or a local rule to the availability of setoffs. To be clear, a "local rule" is a local district court rule, not a state court rule. *Id.* at n.11; *see also* § 3154 (listing receiverships as a local rule topic). No Northern District of Texas local rule has been cited to us. Though we are not to apply state law explicitly, such law may nonetheless be useful: "Of course, in the absence of substantial federal precedent in a particular context, federal courts are quite likely to look to state law for guidance." 12 Wright & Miller, Fed. Prac. & Proc. § 2983.

We start our examination of historical practices with our own precedent on the SIB receivership. Ten years ago, we identified the substantive state law that controls the SIB receiver's claims of fraudulent transfers — the Texas Uniform Fraudulent Transfer Act ("TUFTA"). *Janvey v. Brown*, 767 F.3d 430, 436 (5th Cir. 2014); Tex. Bus. & Com. Code § 24.001. The district court had supplemental jurisdiction over the receiver's state-law TUFTA claims. *Janvey*, 767 F.3d at 434 n.10. That Act also supports the claims in this case. As to procedural rules, we have been cited to no precedent involving the SIB receivership in which this court explored historical equity practice or the existence of a local rule, perhaps because a specific equity procedural issue has not been the subject of dispute.

No. 22-10235
c/w No. 22-10429

Next, we consider the briefing in this appeal. Magness's brief explores historical equity practice to the limited extent of discussing Section 959(b) and the general history of setoffs, including that the right to a setoff was recognized in equity. The Receiver does not directly discuss details of historical practice. The most important practice would be whether setoffs of opposing claims were allowed, dollar for dollar, when one party was insolvent.

Further as to historical practice, we found an opinion involving a receivership for an insolvent national bank. *Scott v. Armstrong*, 146 U.S. 499 (1892). The Supreme Court stated that being able to "assert set-off at law is of statutory creation, but courts of equity from a very early day were accustomed to grant relief in that regard independently as well as in aid of statutes upon the subject." *Id.* at 507. The Court described when a setoff was permitted:

> In equity, relief was usually accorded, says Mr. Justice Story, (Eq. Jur. § 1435,) "where, although there are mutual and independent debts, yet there is a mutual credit between the parties, founded at the time upon the existence of some debts due by the crediting party to the other. By 'mutual credit,' in the sense in which the terms are here used, we are to understand a knowledge on both sides of an existing debt due to one party, and a credit by the other party, founded on and trusting to such debt, as a means of discharging it."

*Id.* (quoting 2 Joseph Story, Commentaries on Equity Jurisprudence § 1435 (13th ed. 1886)). The Court held that "a debtor of the bank [can] set off against his indebtedness the amount of a claim he holds against the bank" if certain conditions were satisfied. *Id.* at 502 (certified question one), 513 (Court's answer).

The cite in *Scott* to Justice Story's writings leads us to examine his *Commentaries on Equity Jurisprudence*. An entire chapter concerns setoffs. 2 Story, Commentaries §§ 1430–1444. There are a variety of details,

11

No. 22-10235
c/w No. 22-10429

such as generally not allowing a setoff of a liquidated and an unliquidated claim. § 1440 n.6. Without question, though, setoffs were a recognized part of historical equity practice in federal courts. The detail of the *Commentaries* is daunting, as is the frequency that Justice Story breaks out into multiple, lyrical sentences in Latin. Absent briefing, we will not explore the *Commentaries* beyond a few observations in the concluding section of this opinion.

In summary, setoffs were a right in federal courts before the federal procedural rules were adopted. Those practices continue to apply under Rule 66. The district court and both parties discuss Texas procedures for setoffs, though, not historical practice in federal courts. Due to that acceptance and the absence of briefing on pre-Rules federal practice, we apply Texas procedures on the specifics of setoffs unless they are inconsistent with more general principles regarding historical practice in federal courts.

Under Texas law, a setoff "is proper only where demands are mutual, between the same parties, and in the same capacity or right." *Capital Concepts Props. 85-1 v. Mutual First, Inc.*, 35 F.3d 170, 175 (5th Cir. 1994) (quoting *Brook Mays Organ Co. v. Sondock*, 551 S.W.2d 160, 166 (Tex. Civ. App.—Beaumont 1977, writ ref'd n.r.e.)). The 1892 *Scott* opinion also described mutuality as necessary for a setoff. 146 U.S. at 507.

A Texas legal encyclopedia describes a setoff this way:

> A setoff is a form of counterclaim originally created by statute, which brings together obligations of opposing parties to each other and, by judicial action, makes each obligation extinguish the other. Setoff is in the nature of a cross-action.

67 Tex. Juris. 3d *Setoffs, Counterclaims, Etc.* § 3 (2023) (footnotes omitted).

One of the authorities cited in that section of *Texas Jurisprudence* gave this description: "The great object of all discounts or set-offs is, to adjust the

indebtedness between the parties, and to permit executory process to be enforced only for the balance that may be due." *Nalle v. Harrell*, 12 S.W.2d 550, 551 (Tex. Comm'n App. 1929) (quoting *Simpson v. Huston*, 14 Tex. 476, 481 (1855)). At the time of *Nalle*, procedural statutes controlled setoffs. *See* TEX. REV. CIV. STAT. ANN. arts. 2014–2017 (1925). For example, a setoff by one party of unliquidated claims could not be made against the other party's certain demands unless they arose "out of or incident to, or connected with, the plaintiff's cause of action." art. 2017. This prohibition currently appears in Texas Rule of Civil Procedure 97(g), barring setoff or counterclaims of tort and contractual demands but with the same exceptions as in Article 2017.

As the *Texas Jurisprudence* explanation states, a setoff is a "form of counterclaim." 67 TEX. JURIS. 3d *Setoffs, Counterclaims, Etc.* § 3. To be classified as a setoff, we know the dueling demands must be mutual and involve the same parties in the same capacity. *Capital Concepts*, 35 F.3d at 175. The Texas Supreme Court held that when a setoff is brought as a counterclaim, it is not a compulsory one. *See Bonham State Bank v. Beadle*, 907 S.W.2d 465, 470 (Tex. 1995) (Owen, J.) (discussing general civil litigation, not a receivership).

Janvey relies on a holding in *Beadle* "that no right of set-off as to judgments can come into existence until both judgments have been rendered." *Id.* at 469 (quoting *Spokane Sec. Fin. Co. v. Bevan*, 20 P.2d 31, 33 (Wash. 1933)). From that, Janvey argues that because there are not two judgments, there can be no setoff. We find that reading creates an improper barrier at least for this equitable receivership action. A setoff is a species of counterclaim, one that must satisfy certain rules. A Texas procedural rule provides that when "the defendant establishes a demand against the plaintiff upon a counterclaim exceeding that established against him by the plaintiff, the court shall render judgment for defendant for such excess." TEX. R. CIV.

P. 302. Even if labeled a counterclaim, competing obligations that are mutual and involve the same parties in the same capacity can be the subject of a set-off.

The *Beadle* court identified one significant procedural distinction if two judgments are being setoff. Unlike with a counterclaim, the right to recover the amount owed under a prior judgment is not factually dependent on the outcome of the second lawsuit because the earlier judgment is final. *Beadle*, 907 S.W.2d at 470.

*Beadle* itself provides support that setoffs do not always require two judgments. The court described the difference between a setoff based on two judgments and counterclaims in two ways. First was this:

> Unlike a counterclaim that has not been reduced to judgment (which must be asserted if it arises out of the same transaction or occurrence as the plaintiff's claims, *see* Tex. R. Civ. P. 97(a)), the right to recover the amount owed under a prior final judgment is not factually dependent on the disposition of the second lawsuit.

*Id.* Second, the court stated that "although the right to offset one claim against another can be an affirmative defense, the right to offset two judgments is not." *Id.* (citing *Ketcham v. Selles*, 772 P.2d 419, 421 (Or. Ct. App. 1989)).

In addition, just before the statement on which Janvey relies, the *Beadle* court addressed the argument that there could not be a setoff because the party seeking it should have sought it even earlier, namely, before the second judgment was entered. *Id.* at 469. The court was a bit tentative but stated "[e]ven if the setoff sought by Bonham Bank could have been awarded in that court [that entered the second judgment], it does not follow that Bonham Bank is forever foreclosed from seeking an offset in another forum." *Id.* That at least leaves open whether a setoff can be obtained after one judgment.

14

We find further guidance from another opinion cited in *Beadle*. A set-off was an affirmative defense when "the judgment debtor was seeking to offset mere *claims* that he held against the judgment creditor." *Ketcham*, 772 P.2d at 421 (emphasis in original). That description supports that a setoff of a previously unlitigated claim at least *may* be brought in the suit that leads to the first judgment. The *Beadle* court might disagree that such claims are waived if not brought because it identified them as permissive counterclaims. As to whether a defendant who has a valid judgment against the plaintiff must argue for a setoff in the second lawsuit brought by its debtor, the *Beadle* court was clear it was not necessary. *Beadle*, 907 S.W.2d at 469–70.

In summary, we do not interpret *Beadle* as prohibiting in a receivership a counterclaim that is in effect a setoff. Moreover, our review of the historical practice in equity discovered no two-judgment requirement.

Could, though, a district court overseeing a receivership require that a defendant's setoff claims — its counterclaims not yet reduced to judgment — be brought at some specific stage of the case, either simultaneously with the receiver's claims or always after those claims? We already mentioned that, by general order, the district court in 2010 stated creditors were "enjoined, without prior approval of the Court, from . . . [t]he set off of any debt owed by the Receivership Estate . . . based on any claim against the Receiver or the Receivership Estate." How any other setoffs may have been handled is not before us, and by its terms the order did not prohibit bringing a claim for a setoff. We do not interpret *Beadle*, expressing general Texas procedures, as prohibiting a district court from creating special rules for setoffs when overseeing a receivership. All we know here is that the district court required permission to bring the setoff and did not bar them categorically in any order identified to us. Magness was refused permission; thus, this appeal and our need to analyze the issue.

Magness's denied motions for leave to file a new complaint were seeking first a judgment on the amount of Magness's claims, then to have it setoff against the Receiver's judgment. Because of *Beadle*, we conclude that under state law, there was neither forfeiture nor waiver of the issue of setoff by waiting to raise it until after the judgment against Magness became final. Historical equity practice also does not raise a bar. Finally, the district court did not consider the possibility that Magness had waived a setoff by agreeing to a release of the $79 million if a writ of certiorari were denied. Consequently, we will not consider that possibility either.

Preliminaries behind us, we now consider whether Magness has shown error in the district court's denial of any setoff.

## II. Magness's right to a setoff in these proceedings

In its Second Setoff Order, the district court denied a setoff in this case for three reasons:

(A) Summary proceedings on claims are permitted in equity receiverships, and Magness's seeking to bring an independent setoff action is an invalid effort to bypass those summary proceedings.

(B) Magness's setoff claim arises in equity, and Texas law does not permit a setoff under similar facts. The court cited *Cocke v. Wright*, 39 S.W.2d 590, 592–93 (Tex. Comm'n App. 1931).

(C) Magness's amended complaint would be futile. Because the setoff claim is equitable, Magness's claim would fail because his previous participation in fraudulent transfers means he has "unclean hands."

We will discuss each of these reasons.

No. 22-10235
c/w No. 22-10429

### A. Summary receivership procedures allow rejecting setoffs

In concluding that setoffs could be prohibited, the district court relied on caselaw that required all claims be brought in the Receivership:

> Courts frequently approve summary claims processes that deny claimants the right to pursue individual actions against the receivership estate. *See, e.g.*, *SEC v. Basic Energy & Affiliated Res., Inc.*, 273 F.3d 657, 668 (6th Cir. 2001); *SEC v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992); *SEC v. Hardy*, 803 F.2d 1034, 1040 (9th Cir. 1986).

None of those authorities, though, specifically address whether it is proper to disallow setoffs when employing summary claims processing.

The district court also cited three of this court's opinions in the SIB receivership to demonstrate our approval of the district court's summary procedures. *See Zacarais v. Stanford Int'l Bank, Ltd.*, 945 F.3d 883, 903 (5th Cir. 2019); *SEC v. Stanford Int'l Bank, Ltd.*, 551 F. App'x 766, 769–71 (5th Cir. 2014); *SEC v. Stanford Int'l Bank Ltd.*, 465 F. App'x 316, 317 (5th Cir. 2012). This court's *Zacarais* opinion did not address setoffs; it upheld the district court's orders that prohibited suits by other investors against two parties that settled with the Receiver. *See Zacarias*, 945 F.3d at 889. The 2014 opinion was a later appeal in the same dispute as the 2012 opinion, and that later appeal had no setoff analysis. *See SEC*, 551 F. App'x 766.

The cited 2012 Fifth Circuit opinion did discuss a setoff claim, but it was not comparable to the one Magness presents. There were three parties involved, and that makes all the difference:

> Trustmark National Bank, a creditor of Stanford International Bank Limited, appeals the decision of the district court allowing HP Financial Services Venezuela ("HPFS") to present a letter of credit to Trustmark for payment, but refusing to allow Trustmark to offset the funds from Stanford who is currently under the receivership of Ralph S. Janvey.

17

No. 22-10235
c/w No. 22-10429

*SEC*, 465 F. App'x at 317 (two parentheticals omitted).

SIB deposited cash collateral with Trustmark, which caused Trustmark to issue letters of credit to several companies doing business with SIB. Therefore, Trustmark was a secured creditor, with setoff rights on the collateral should one of the businesses call on Trustmark to honor the letter. *Id.* at 318. One of the businesses, HPFS, was not paid on its lease of computer equipment to SIB; Trustmark refused to honor the letter of credit because the district court had already entered the bar order. *Id.*

In resolving the dispute, the district court found that "the letter of credit transaction involved three separate contracts and that the 'obligations and duties created by the contract between [Trustmark] and [HPFS] are completely separate and independent from the underlying transaction between'" HPFS and Stanford. *Id.* at 319 (footnote omitted). We affirmed. *Id.* at 321. We held that the party issuing a letter of credit must honor it from its own assets. *Id.* at 320. Therefore, Trustmark had to pay HPFS with its funds, but its access to the cash collateral, now property of the receivership estate, had to be through the claims process.

The claim here is not tripartite, and there was no initial obligation on Magness to expend his own funds that stands between his claims and the Receivership. Our 2012 *Stanford* opinion involving Trustmark does not resolve the fundamental issue of whether a receivership may ignore recognition of equitable setoff rights in Texas. Indeed, we have not been cited to any authority in which this court, as to the SIB receivership or any other, has addressed the availability of a setoff. If such authority exists, it is not before us on this appeal.

### B. *Texas law on setoffs in receiverships*

The district court also determined that Texas law would not allow a setoff in this case, holding that "Texas equity jurisprudence supports a

refusal to allow setoff in exactly this circumstance. *Cocke v. Wright*, 39 S.W.2d 590, 592–93 (Tex. Comm'n App. 1931)." Our earlier discussion of historical equity practices included recognition that state law is at times applied absent clear evidence of historical practice.

We start by explaining that the Texas Commission of Appeals, which issued the *Cocke* opinion, formerly assisted the Texas Supreme Court with its backlog.[5] The weight given to Commission of Appeals opinions was explained by the state Supreme Court when it held the opinions "that were not adopted or approved by the Supreme Court . . . are not binding on the court in the same sense that the approved and adopted opinions are, but they are given great weight." *National Bank of Com. v. Williams*, 84 S.W.2d 691, 692 (Tex. 1935). The court made that holding when discussing one opinion that had not been "approved." *Id.* (citing *Central Nat'l Bank of Com. v. Lawson*, 27 S.W.2d 125 (Tex. Comm'n App. 1930)).[6] We examined the *Lawson* opinion to learn how to identify an unapproved opinion. Immediately after the end of that Commission of Appeals opinion appears the same statement by the Chief Justice of the Supreme Court that comes after the end of the *Cocke*

---

[5] The Texas Legislature twice created commissions to assist the state Supreme Court. Margaret Waters, *Commissions of Appeals*, *in* 2 New Handbook of Texas 251 (1996). "In 1918, because the Supreme Court was several years behind with its docket, [a second] Commission of Appeals was established in two sections with three commissioners each. Decisions had to be submitted and accepted by . . . the Supreme Court." *Id.* This commission was abolished in 1945. *Id.*

[6] The Texas Supreme Court cited *Williams* in 2022 for the rule on adopted opinions, indicating the rule remains valid. *See Jordan v. Parker*, 659 S.W.3d 680, 685 n.20 (Tex. 2022). The *Jordan* opinion discussed an approved Commission of Appeals opinion, *id.* at 685–86, which stated this after its concluding paragraph: "Opinion adopted by the Supreme Court." *Clark v. Gauntt*, 161 S.W.2d 270, 273 (Tex. Comm'n App. 1942). The Supreme Court had made adoption automatic in 1934: "All opinions of the Commission of Appeals, accepted by the Court, will from and after this, the 21st of March [1934], be adopted by the Supreme Court, and the Clerk will enter this order in the minutes." *Courts – Opinions of Texas Commission of Appeals*, 12 Tex. L. Rev. 356, 358 (1934).

opinion: "Judgments of the Court of Civil Appeals and district court are both affirmed, as recommended by the Commission of Appeals." *Lawson*, 27 S.W.2d at 129; *Cocke*, 39 S.W.2d at 593. Thus, *Cocke* was not an approved opinion but is entitled to "great weight," equivalent perhaps to an opinion by an intermediate Texas appellate court.

We now examine the dispute that led to the *Cocke* opinion. The litigation arose from the financial failure of the United Home Builders of America, which was a co-operative lending association that operated independently for a little more than a year beginning in January 1919. *Cocke*, 39 S.W.2d at 591. United Home Builders fell under the supervision first of a state agency, and then was controlled by a court-appointed receiver named G.G. Wright. *Id.* The Texas Legislature authorized such associations in 1915, then repealed the statute in 1923 and required their liquidation. *See Barlow v. Wright*, 279 S.W. 593, 595–96 (Tex. Civ. App.—Dallas 1925, writ ref'd). The caselaw we reviewed does not suggest these associations were another era's Ponzi schemes; instead, the decisions expose them as a doomed business model authorized by misbegotten legislation.

To understand some details, we find the Texas Court of Civil Appeals *Cocke* opinion, affirmed by the Commission of Appeals, to provide useful additional explanations. *See Cocke v. Wright*, 23 S.W.2d 449 (Tex. Civ. App.—Dallas 1929), *aff'd*, 39 S.W.2d 590 (Tex. Comm'n App. 1931). The district court here considered *Cocke* to have comparable facts because debtor Cocke had a claim against United Home Builders based on money he paid the association, while United Home Builders's receiver had a claim against Cocke based on an unpaid real estate loan. *Id.* at 451 (showing Cocke had two unpaid loans). Cocke's claim against the receiver had been reduced to judgment in the receivership action prior to the trial on the receiver's claim that resulted in a money judgment against Cocke. *Id.* We have left out details, but key is the existence of two, potentially offsetting judgments.

No. 22-10235
c/w No. 22-10429

The trial court and both appellate courts denied a setoff. The principal equitable factor was that there were two classes of members of the insolvent association. One included those who, like Cocke, were creditors of the insolvent association and also borrowed from the association; the other were those who had invested but never took out loans. *Cocke*, 39 S.W.2d at 592. The Commission of Appeals relied on the lack of funds to satisfy all claims to state that "care should be taken to adjust the burden equally, and not throw on either the borrowers or nonborrowers more than their respective share." *Id.* (quoting *People's Building & Loan Ass'n v. McPhillamy*, 32 So. 1001, 1006 (Miss. 1902)). The goal of imposing losses equally required that borrowers repay their loans in full, but the assets of the estate would be divided among all claimants on a *pro rata* basis. *Id.*

Nonetheless, *Cocke* did not categorically disallow a setoff in the situation of an insolvency. The Commission of Appeals stated a setoff could have been sought at the trial that resulted in a judgment for the receiver:

> The [trial] court had rendered a judgment in favor of the receiver against Cocke and wife, from which no appeal was taken. This judgment concludes the rights of Cocke and wife in the premises, and establishes the lien on their property to secure its satisfaction. *Even though Cocke and wife had the right to plead an offset in the case, wherein judgment was rendered which is sought to be enjoined, Cocke's claim against the partnership, as now set up, should have interposed upon the trial of the case.*

*Id.* at 593 (emphasis added).

Allowing consideration of setoffs if timely raised is consistent with a slightly earlier opinion, involving the same receiver, the same debtor, and the same three appeals court judges.[7] *See Cocke v. Wright*, 299 S.W. 446 (Tex.

---

[7] Though each opinion names the writing judge but not other panel members, we find in the lists of judges that appear in the introductory pages of the printed South Western

Civ. App.—Dallas 1927, no writ). That decision allowed Cocke, who had been the attorney for the association, to offset the amount he owed on a loan by the amount he was owed as salary and for certain fees. *Id.* at 449. Both the receiver's claim for the balance on a loan and Cocke's claims for what he was owed as counsel were shown by evidence in this single action, so there were not two judgments. *Id.* at 447–48. The court denied that allowing the setoff would give Cocke a preference over others who had no counterclaim they could assert. *Id.* at 449. The court's analysis was that the receiver, in effect, never received the value of assets that was equivalent to the fees owed Cocke, as that setoff amount was not "due" from Cocke. *Id.* (citing *Scott*, 146 U.S. at 510).

One way to justify the different outcomes by the same three judges just two years apart is that in one case, Cocke's counterclaim for legal fees was heard in the same trial as the receiver's claim; in the other, Cocke did not present his claim until execution on the judgment against him was sought.

We conclude these opinions weigh in favor, not against, allowing consideration of setoffs with equity receiverships. Even so, the only court to analyze the different outcomes in the 1927 and 1931 *Cocke* opinions held otherwise. *See Langdeau v. Dick*, 356 S.W.2d 945, 956 (Tex. Civ. App.—Austin, 1962, writ ref'd n.r.e.) (relying on the denial of a setoff by the Commission of Appeals without examining the effect of Cocke's failure to present the issue at trial). Regardless of interpretation, the Commission of Appeals *Cocke* opinion has been cited by *Langdeau* and only two other state courts[8] (and

---

Reporters that only three, and the same three, judges were on the Dallas Court of Civil Appeals at the time of both opinions. *See* 299 S.W. v (1928); 23 S.W.2d v (1930).

[8] *Thompson v. Prince*, 126 S.W.2d 574, 576 (Tex. Civ. App.—Waco 1939, writ ref'd); *Fidelity Bldg. & Loan Ass'n v. Thompson*, 45 S.W.2d 167, 170 (Tex. Comm'n App. 1932, opinion not adopted).

once by the district court here) to support denying a setoff. The opinion's relative lack of impact makes us cautious in concluding it represents current Texas law.

Much more recent Texas judicial opinions than those in the *Wright* and *Cocke* family discuss setoff rights in the context of receiverships. *See, e.g.*, *New Braunfels Nat'l Bank v. Odiorne*, 780 S.W.2d 313 (Tex. Ct. App.—Austin 1989, writ denied). In *Odiorne,* the court held that "the legislature did not intend for the Insurance Code to destroy the common-law right of offset simply because a receiver had become the successor-in-title to the property of the insurer." *Id.* at 319. Therefore, the "receiver takes the insurer's property subject to the rights and equities of third persons." *Id.* An Eleventh Circuit opinion discussed by the parties in the current appeal dealt with an SEC receivership that allowed setoffs. *See SEC v. Elliott*, 953 F.2d 1560, 1573 (11th Cir. 1992). We thus find no categorical rule against setoffs in receiverships.

Nonetheless, we need not decide whether Magness's claims would otherwise be eligible for a setoff because of our conclusions about the final reason the district court gave for denying a setoff.

### C. *An amended complaint would be futile*

The primary question here is when a setoff can be denied. To start, we return to Justice Story's discussion of the general rules of equity.

Justice Story wrote that among the distinctions between courts of equity and courts of law is that "[s]ome modifications of the rights of both parties may be required; some restraints on one side, or on the other, or perhaps on both sides; some adjustments involving reciprocal obligations or duties." 1 STORY, COMMENTARIES § 27. Further, though courts of equity "have prescribed forms of proceeding, the latter are flexible, and may be suited to the different postures of cases. . . . [T]hey may vary, qualify, restrain, and

model the remedy so as to suit it to mutual and adverse claims, controlling equities, and the real and substantial rights of all the parties." § 28. Those "prescribed forms of proceeding" subject to variance include setoffs.

Justice Story also wrote that among the recognized equity maxims is "he who seeks equity must do equity[,] . . . for the court will never assist a wrong-doer in effectuating his wrongful and illegal purpose." § 64e. In a discussion of fraud, Justice Story gives a broad definition: "Fraud indeed, in the sense of a Court of Equity, properly includes all acts, omissions, and concealments which involve a breach of legal or equitable duty, trust, or confidence . . . or by which an undue and unconscientious advantage is taken of another." § 187. Finally, "a Court of Equity has an undoubted jurisdiction to relieve against every species of fraud." § 188. Justice Story uses the word "fraud" in a broader sense than we might today. Regardless, a receiver has authority to "relieve" against a setoff right that exists only because of "an undue and unconscientious advantage."

Our survey of historical equity practice is useful but does not give us the more granular detail we need. Therefore, we follow the course we mentioned before that "in the absence of substantial federal precedent in a particular context, federal courts are quite likely to look to state law for guidance." 2 Wright & Miller, Fed. Prac. & Proc. § 2983.

Under Texas law, "a party seeking an equitable remedy must do equity and come to court with clean hands." *Truly v. Austin*, 744 S.W.2d 934, 938 (Tex. 1988). "[E]quity will compel fair dealing, disregarding all forms and subterfuges, and looking only to the substance of things," and "[w]hether a party has come into court with clean hands is a matter for the sound discretion of the court." *Jackson L. Off., P.C. v. Chappell*, 37 S.W.3d 15, 27 (Tex. App.—Tyler 2000, pet. denied). Hence, as the party seeking an equitable remedy, Magness must come to court with clean hands and

demonstrate entitlement to a setoff because of "the *substance* of things." *Id*. (emphasis added). The unclean hands "doctrine applies against a litigant whose own conduct in connection with the same matter or transaction has been unconscientious, unjust, marked by a want of good faith, or violates the principles of equity and righteous dealing." *Flores v. Flores*, 116 S.W.3d 870, 876 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.). As one Texas Court of Appeals stated:

> The rule does not go so far as to prohibit a court of equity from giving its aid to a bad or faithless man or a criminal. The dirt upon his hands must be his bad conduct in *the transaction complained of*. If he is not guilty of inequitable conduct toward the defendant in that transaction, his hands are as clean as the court can require.

*Lazy M Ranch, Ltd. v. TXI Operations, LP*, 978 S.W.2d 678, 683 (Tex. App.—Austin 1998, pet. denied) (emphasis in original) (quoting 2 POMEROY'S EQUITY JURISPRUDENCE § 399, at 95–96 (5th ed.1941)).

We agree with the analysis in one of this court's unpublished opinions that "[t]he balancing of the equities required to evaluate money had and received and unclean hands can 'sound[] in negligence' too." *Midwestern Cattle Mktg., L.L.C. v. Legend Bank, N. A.*, 800 F. App'x 239, 251 (5th Cir. 2020) (alteration in original) (quoting *Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 841–42 (5th Cir. 2004)). Specifically, *Bank of Saipan* interpreted a Texas unclean hands defense as comparable to "a comparative (as opposed to contributory) negligence regime . . . for ordinary tort claims." *Bank of Saipan*, 380 F.3d at 841.

When evaluating Janvey's conduct regarding SIB, the Supreme Court of Texas stated that a transferee seeking to prove good faith must show that it investigated the suspicious facts diligently. *Janvey*, 592 S.W.3d at 131. "A transferee who simply accepts a transfer despite knowledge of facts leading it

to suspect fraud does not take in good faith." *Id.* Further, that court held, because Magness had actual knowledge of facts that raised a suspicion of fraud, and he chose to "remain willfully ignorant of any information an investigation might reveal," his conduct was "incompatible with good faith" and incapable of being "characterized as acting with honesty in fact." *Id.* As a result, Magness's actions constituted comparative negligence of "such magnitude that [Magness] did not come to the court of equity with clean hands." *Jackson*, 37 S.W.3d at 27.

The statutory text of TUFTA also supports this conclusion, as Magness was held liable under the provision that requires "*actual intent* to hinder, delay, or defraud any creditor of the debtor." Tex. Bus. & Com. Code § 24.005(a)(1) (emphasis added).

The district court here properly analyzed Janvey's actions. The court determined that equity barred a setoff because Magness participated in a fraudulent transfer. The transfer was Magness's obtaining an $88.2 million loan that allowed recoupment of the $79 million used to purchase CDs, plus interest. The loan under those conditions gave him "unclean hands." Supporting this finding is that a jury found Magness had enough notice of SIB's possible financial improprieties to be suspicious. *Janvey*, 977 F.3d at 426. Magness may well have been acting on those suspicions in seeking a loan. "A transferee on inquiry notice of fraud cannot shield itself from TUFTA's clawback provision without diligently investigating its initial suspicions" of fraud. *Id.* at 426–27 (explaining the answer to the certified question given in *Janvey*, 592 S.W.3d at 133). What an investigation likely would have revealed is irrelevant. *Id.* "The record does not show [Magness] accepted the fraudulent transfers in good faith." *Id.* at 428.

In summary, had Magness not been one of the largest investors and not been given special — dare we say, preferential — treatment from SIB, he would not have received the $79 million for which repayment has been

ordered. His funds would have remained with SIB, and what was left of them seized by the Receiver.

The district court determined that allowing Magness a setoff would allow him to gain an improper preference over other creditors. Of course, a setoff is not itself a preference. In the Supreme Court's 1892 *Scott v. Armstrong* opinion we discussed earlier, the Court held that if "a set-off is otherwise valid, it is not perceived how its allowance can be considered a preference." *Scott*, 146 U.S. at 510. Immediately before that statement, the Court stated an "otherwise valid" transaction must occur "prior to insolvency and not in contemplation thereof." *Id.* It is a fair assessment that Magness obtained the $79 million loan because he contemplated significant financial troubles ahead for SIB. The district court's reasoning that a setoff here would be inequitable is thus consistent with *Scott*'s holding.

There are rights to setoffs in receiverships; Magness may not have waited too long to assert the setoff. Even so, the district court did not abuse its discretion in refusing to allow Magness to pursue a setoff of the claims he raised in his proposed amended complaints. AFFIRMED.